# HICKS, DISTRICT ATTORNEY OF ORANGE COUNTY, ET AL. v. MIRANDA, DBA WALNUT PROPERTIES, ET AL.

No. 74–156.  Argued March 24, 1975—Decided June 24, 1975

*Oretta D. Sears, pro se,* and *Arlo E. Smith,* Assistant Attorney General of California, argued the cause for appellants. With them on the briefs were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, *Alvin J. Knudson,* Deputy Attorney General, *Cecil Hicks, pro se, Michael R. Capizzi,* and *Ronald H. Bevins.*

*Stanley Fleishman* and *Sam Rosenwein* argued the cause for appellees. With them on the brief was *David M. Brown.*

MR. JUSTICE WHITE delivered the opinion of the Court.

This case poses issues under *Younger* v. *Harris,* 401 U. S. 37 (1971), *Samuels* v. *Mackell,* 401 U. S. 66 (1971), and related cases, as well as the preliminary question as to our jurisdiction of this direct appeal from a judgment of a three-judge District Court.

I

On November 23 and 24, 1973, pursuant to four separate warrants issued seriatim, the police seized four copies of the film "Deep Throat," each of which had been shown at the Pussycat Theatre in Buena Park, Orange

County, Cal.[1]  On November 26 an eight-count criminal misdemeanor charge was filed in the Orange County Municipal Court against two employees of the theater, each film seized being the subject matter of two counts in the complaint.  Also on November 26, the Superior Court of Orange County ordered appellees[2] to show cause why "Deep Throat" should not be declared obscene, an immediate hearing being available to appellees, who appeared that day, objected on state-law grounds to the court's jurisdiction to conduct such a proceeding, purported to "reserve" all federal questions, and refused further to participate.  Thereupon, on November 27 the Superior Court held a hearing, viewed the film, took evidence, and then declared the movie to be obscene

---

[1] The first warrant was issued following a viewing of the film by an Orange County Municipal Court judge.  The same judge also issued the other three warrants, the third one after a viewing of the version of the film then showing.  The other two warrants were issued on affidavits of police officers who had witnessed exhibition of the film.  Each of the warrant affidavits other than the first one indicated that the film to be seized was in some respects different from the first print seized.

In response to claims of bad faith which were later made against them, the four police officer appellants asserted that in October 1973, successive seizures of "Deep Throat" had been made under warrant in Riverside County, Cal.  The theater involved in those seizures sought federal relief, which was denied, the seizures being upheld despite challenge under Heller v. New York, 413 U. S. 483 (1973).  It was after this decision, it was asserted, that Buena Park authorities sought warrants for the seizure of "Deep Throat" showing in that city.

[2] The order ran against Vincent Miranda, dba Pussycat Theatre, Walnut Properties, Inc., and theater employees.  Actually, Miranda, who owned the land on which the theater was located, did business as Walnut Properties, and Pussycat Theatre Hollywood was a California corporation of which Miranda was president and a stockholder.  Nothing has been made by the parties of this confusion in identification.

and ordered seized all copies of it that might be found at the theater. This judgment and order were not appealed by appellees.[3]

---

[3] The apparent basis for not pursuing appellate remedies is illuminated in the course of the following colloquy in this case between Judge Ferguson and appellees' counsel which occurred when appellees sought relief, described *infra*, at 340, against the subsequent actions of the Superior Court, Appellate Department.

"THE COURT: Have you taken that order up to the California Court of Appeals?

"MR. BROWN: No, we have not.

"THE COURT: Why not?

"MR. BROWN: Because, your Honor, initially back in November when this first occurred, the day after the hearing we filed the Complaint in this action and one of the bases for relief alleged in the Complaint was the deprivation of the plaintiff's Constitutional rights by virtue of these proceedings and we alleged from the very beginning that those proceedings were violative of California law, clearly, and violative of our Constitutional rights and we asked this Court to give us relief from that specific proceeding. That was the inception of this action, as a matter of fact. Once we had invoked the jurisdiction of this Court properly we sought relief in this Court and we did not press the matter further in the California State Courts.

"THE COURT: Well, how can you go halfway and not go all the way?

"MR. BROWN: Your Honor, at the very first hearing in November we filed the documents with the Superior Court stating that we were reserving all questions of Federal Constitutional law pursuant to the England case. We knew that we may—we had in mind the trap that can be set a litigant in these circumstances. It was our intent from the beginning to allege Federal jurisdiction and to seek relief under the Civil Rights Act for these events and that is why at the very first time we appeared in the Orange County Superior Court we so indicated to the Court that that was the case.

"THE COURT: Yes, but you told me that August the 2nd you appeared before the Superior Court in Orange County and made some kind of a motion—

Instead, on November 29, they filed this suit in the District Court against appellants—four police officers of Buena Park and the District Attorney and Assistant District Attorney of Orange County. The complaint recited the seizures and the proceedings in the Superior Court, stated that the action was for an injunction against the enforcement of the California obscenity stat-

"MR. BROWN: But again, your Honor—

"THE COURT: Let me finish.

"—to set aside Judge McMillan's order with reference to seizures of these two films. He denied your request and my question to you is a simple one. When you go halfway why shouldn't you be required to go all the way?

.      .      .      .      .

"MR. BROWN: It was our purpose in the beginning not to litigate these claims in the State court.

.      .      .      .      .

"THE COURT: Well, don't you think that it is only fit and proper that the California courts should be permitted to eradicate any deficiencies that may occur in the lower courts?

.      .      .      .      .

"THE COURT: All right. Why don't you take it up before the California Supreme Court? That is my question to you.

"MR. BROWN: Because, your Honor, we could have done so but we also had the right to invoke Federal jurisdiction.

"THE COURT: I understand you have the right. That is not my question, as to the jurisdiction of this Court. My question to you is why haven't you given the California Appellate Courts the right and the forum to correct any deficiencies of the California lower courts that you say exist?

"MR. BROWN: Your Honor, this is a situation in which a litigant has a choice. If there is an unsettled question—

"THE COURT: All right. So your answer is you do not want to. Is that your answer?

"MR. BROWN: That's correct.

"THE COURT: All right.

"MR. BROWN: We did not want to do so because we did not consider the question of State law to be an unsettled question.

"THE COURT: All right."

ute, and prayed for judgment declaring the obscenity statute unconstitutional, and for an injunction ordering the return of all copies of the film, but permitting one of the films to be duplicated before its return.

A temporary restraining order was requested and denied, the District Judge finding the proof of irreparable injury to be lacking and an insufficient likelihood of prevailing on the merits to warrant an injunction.[4] He requested the convening of a three-judge court, however, to consider the constitutionality of the statute. Such a court was then designated on January 8, 1974.[5]

Service of the complaint was completed on January 14, 1974, and answers and motions to dismiss, as well as a motion for summary judgment, were filed by appellants. Appellees moved for a preliminary injunction.[6] None

---

[4] Judge Lydick, United States District Judge, to whom the case had been assigned following the initial disqualification of Judge Ferguson, made this ruling. His conclusion was that appellees had "failed totally to make that showing of irreparable damage, lack of an adequate legal remedy and likelihood of prevailing on the merits needed to justify the issuance of a temporary restraining order which would require [the defendants] to disobey the orders of [the state] courts and would restrain the lawful enforcement of a State statute."

[5] Judge Ferguson, but not Judge Lydick, was designated to serve on the three-judge panel. The State of California insists that under 28 U. S. C. § 2284, providing that "[t]he district judge to whom the application for injunction or other relief is presented shall constitute one member" of the three-judge court, Judge Lydick should have been one of the three members. We do not deem the requirement jurisdictional, however; and even though the order appointing the three-judge court called for early filing of any objections to the composition of the court, the issue was never presented to the District Court but is raised here for the first time, and in our view too late.

[6] The motion sought an injunction against the enforcement of California Penal Code § 311 et seq. (1970 ed. and Supp. 1975), as well as §§ 1523–1542 (1970 ed. and Supp. 1975). Sections 1523–

of the motions was granted and no hearings held, all of the issues being ordered submitted on briefs and affidavits. The Attorney General of California also appeared and urged the District Court to follow *People* v. *Enskat*, 33 Cal. App. 3d 900, 109 Cal. Rptr. 433 (1973) (hearing denied Oct. 24, 1973), which, after *Miller* v. *California*, 413 U. S. 15 (1973) (*Miller I*), had upheld the California obscenity statute.

Meanwhile, on January 15, the criminal complaint pending in the Municipal Court had been amended by naming appellees[7] as additional parties defendant and by adding four conspiracy counts, one relating to each of the seized films. Also, on motions of the defendants in that case, two of the films were ordered suppressed on the ground that the two search warrants for seizing "Deep Throat" last issued, one on November 23 and the other on November 24, did not sufficiently allege that the films to be seized under those warrants differed from each other and from the films previously seized, the final two seizures being said to be invalid multiple seizures.[8] Immediately after this order, which was later appealed and reversed, the defense and the prosecution stipulated that for purposes of the trial, which was expected to be forth-

---

. 1542 constitute Chapter 3 of the Penal Code entitled "Of Search Warrants." The sections provide for the issuance, service, and return of search warrants.

[7] Actually, the amended complaint named as defendants Vincent Miranda and Walnut Properties, Inc. See n. 2, *supra*. In referring to the amended criminal complaint, appellees speak of the amendment of the complaint to "include" the names of the "appellees." Brief for Appellees 43.

[8] The prosecution claimed that each film was different, filed affidavits to this effect, and asserted that the official policy was to seize only one copy of a film unless different versions were exhibited. The court limited its attention to the search warrant affidavits which it said did not expressly allege that the last two copies seized were different.

coming, the four prints of the film would be considered identical and only one copy would have to be proved at trial.[9]

On June 4, 1974, the three-judge court issued its judgment and opinion declaring the California obscenity statute to be unconstitutional for failure to satisfy the requirements of *Miller I* and ordering appellants to return to appellees all copies of "Deep Throat" which had been seized as well as to refrain from making any additional seizures. Appellants' claim that *Younger* v. *Harris,* 401 U. S. 37 (1971), and *Samuels* v. *Mackell,* 401 U. S. 66 (1971), required dismissal of the case was rejected, the court holding that no criminal charges were pending in the state court against appellees and that in any event the pattern of search warrants and seizures demonstrated bad faith and harassment on the part of the authorities, all of which relieved the court from the strictures of *Younger* v. *Harris, supra,* and its related cases.

Appellants filed various motions for rehearing, to amend the judgment, and for relief from judgment, also later calling the court's attention to two developments they considered important: First, the dismissal on July 25, 1974, "for want of a substantial federal question" of the appeal in *Miller* v. *California,* 418 U. S. 915 (*Miller II*), from a judgment of the Superior Court, Appellate Department, Orange County, California, sustaining the constitutionality of the very California obscenity statute which the District Court had declared unconstitutional; second, the reversal by the Superior Court, Appellate Department, of the suppression order which had been issued in the criminal case pending in the Municipal Court, the *per curiam* reversal citing *Aday* v. *Superior*

---

[9] The prosecution later asserted that the stipulation did not provide for the return of the suppressed films or of any others. The films were not returned, the suppression order was appealed, and it was reversed. See *infra,* this page.

*Court,* 55 Cal. 2d 789, 362 P. 2d 47 (1961), and saying the *"requisite prompt adversary determination of obscenity under Heller* v. *New York . . .* has been held." [10]

On September 30, the three-judge court denied appellants' motions, reaffirmed its June 4 *Younger* v. *Harris* ruling and, after concluding it was not bound by the dismissal of *Miller II,* adhered to its judgment that the California statute was invalid under the Federal Consti-

---

[10] The showing of "Deep Throat" had meanwhile been resumed by appellees. Soon after *Miller II* and the reversal of the suppression order, the Superior Court of Orange County reaffirmed its order of November 27, 1973, and directed additional seizures of "Deep Throat." Seizures under warrant were also made of the film "The Devil in Miss Jones." At a show-cause proceeding before Judge Ferguson sitting as a single judge, the judge declined to hold appellants in contempt for failing to return the copies of "Deep Throat" covered by the June 4 judgment. His oral ruling was:

"THE COURT: You do not have to argue about that at all any more. Mr. Brown comes before the Court arguing that the contempt occurred because of the failure to turn over three of the films as a result of the November 1973 seizures. The defendants filed a motion to reconsider. An opinion is circulating now among the Three Judge Court with reference to that motion so it would be absurd for me to say that there was a contempt of court for failure to turn over those three films.

. . . . .

"THE COURT: . . .

"Now, with reference to the returning of three of the films, the Court cannot find that there was any contempt in that, either, primarily because that issue of returning the films had been taken under submission by the Three Judge Court and there was no specific order outstanding which required immediate compliance. So the Order to Show Cause with reference to contempt will be vacated."

Judge Ferguson did, however, issue a preliminary injunction against further seizures of the two films. Title 28 U. S. C. §§ 2284 (3) and (5) forbid a single judge to issue an interlocutory injunction in a three-judge-court case. The status of Judge Ferguson's preliminary injunction is not at issue here.

tution. In response to appellants' claim that they were without power to comply with the June 4 injunction, the films being in the possession of the Municipal Court, the court amended the injunctive portion of its order so as to read as follows:

> "The defendants shall in good faith petition the Municipal Court of the North Orange County Judicial District to return to the plaintiffs three of the four film prints seized from the plaintiffs on November 23 and 24, 1973, in the City of Buena Park."

Appeals were taken to this Court from both the judgment of June 4 and the amended judgment of September 30. We postponed further consideration of our jurisdiction to the consideration of the merits of the case. 419 U. S. 1018 (1974).[11]

## II

We deal first with questions about our jurisdiction over this direct appeal under 28 U. S. C. § 1253.[12] At the

---

[11] Because the amended judgment was entered in response to timely motions for rehearing and to amend the June 4 judgment, appellees insist that it is the amended judgment that is before the Court. Appellants filed notices of appeal from the June 4 judgment, despite their pending motions, and some contend that the District Court had no jurisdiction to enter the September 30 order. Some appellants also appealed from the September judgment, however, and we think the appellees have the better view of this issue. The amended judgment is before us.

[12] Section 1253 provides:

"Except as otherwise provided by law, any party may appeal to the Supreme Court from an order granting or denying, after notice and hearing, an interlocutory or permanent injunction in any civil action, suit or proceeding required by any Act of Congress to be heard and determined by a district court of three judges."

Section 2281 requires three-judge courts under certain circumstances:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restrain-

outset, this case was concededly a matter for a three-judge court. Appellees' complaint asserted as much, and they do not now contend otherwise.[13] Furthermore, on June 4 the District Court declared the California obscenity statute unconstitutional and ordered the return of all copies of the film that had been seized. Appellees do not claim that this order, which would have aborted the pending criminal prosecution, was not an injunction within the meaning of § 1253 and was not appealable here. The jurisdictional issues arise from events that occurred subsequent to June 4.

## A

The first question emerges from our summary dismissal in *Miller II*. Appellants claimed in the District Court, and claim here, that *Miller II* was binding on the District Court and required that court to sustain the California obscenity statute and to dismiss the case. If appellants are correct in this position, the question arises whether *Miller II* removed the necessity for a three-judge court under the rule of *Bailey* v. *Patterson*, 369 U. S. 31 (1962), in which event our appellate jurisdiction under 28 U. S. C. § 1253 would also evaporate.

We agree with appellants that the District Court was in error in holding that it could disregard the decision in *Miller II*. That case was an appeal from a decision by a

___

ing the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

[13] Although only local officers were defendants, they were enforcing a statewide statute and are state officers for the purposes of § 1253. *Spielman Motor Co.* v. *Dodge*, 295 U. S. 89, 91–95 (1935).

state court upholding a state statute against federal constitutional attack. A federal constitutional issue was properly presented, it was within our appellate jurisdiction under 28 U. S. C. § 1257 (2), and we had no discretion to refuse adjudication of the case on its merits as would have been true had the case been brought here under our certiorari jurisdiction. We were not obligated to grant the case plenary consideration, and we did not; but we were required to deal with its merits. We did so by concluding that the appeal should be dismissed because the constitutional challenge to the California statute was not a substantial one. The three-judge court was not free to disregard this pronouncement. As Mr. Justice Brennan once observed, "[v]otes to affirm summarily, and to dismiss for want of a substantial federal question, it hardly needs comment, are votes on the merits of a case . . . ," *Ohio ex rel. Eaton* v. *Price,* 360 U. S. 246, 247 (1959); cf. R. Stern & E. Gressman, Supreme Court Practice 197 (4th ed. 1969) ("The Court is, however, deciding a case on the merits, when it dismisses for want of a *substantial* question . . ."); C. Wright, Law of Federal Courts 495 (2d ed. 1970) ("Summary disposition of an appeal, however, either by affirmance or by dismissal for want of a substantial federal question, is a disposition on the merits"). The District Court should have followed the Second Circuit's advice, first, in *Port Authority Bondholders Protective Committee* v. *Port of New York Authority,* 387 F. 2d 259, 263 n. 3 (1967), that "unless and until the Supreme Court should instruct otherwise, inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise"; and, later, in *Doe* v. *Hodgson,* 478 F. 2d 537, 539, cert. denied *sub nom. Doe* v. *Brennan,* 414 U. S. 1096 (1973), that the lower courts are bound by sum-

mary decisions by this Court " 'until such time as the Court informs [them] that [they] are not.' "

Although the constitutional issues which were presented in *Miller II* and which were declared to be insubstantial by this Court, could not be considered substantial and decided otherwise by the District Court, we cannot conclude that *Miller II* required that the three-judge court be dissolved in the circumstances of this case.[14] Appellees, as plaintiffs in the District Court, not only challenged the enforcement of the obscenity statute but also sought to enjoin the enforcement of the California search warrant statutes, Penal Code §§ 1523–1542 (1970 ed. and Supp. 1975), insofar as they might be applied, contrary to *Heller* v. *New York,* 413 U. S. 483 (1973), to permit the multiple seizures that occurred in this case. The application for a preliminary injunction made this aim of the suit quite express. The three-judge court in its June 4 decision declared the obscenity statute unconstitutional and ordered four copies of the film returned. Its constitutional conclusion was reaffirmed on September 30, despite *Miller II,* and its injunction was to some extent modified. *Miller II,* however, had nothing to do with the validity of multiple seizures as an issue wholly independent of the validity of the obscenity statutes.

---

[14] Of course, *Miller II* would have been decisive here only if the issues in *Miller II* and the present case were sufficiently the same that *Miller II* was a controlling precedent. Thus, had the District Court considered itself bound by summary dismissals of appeals by this Court, its initial task would have been to ascertain what issues had been properly presented in *Miller II* and declared by this Court to be without substance. Ascertaining the reach and content of summary actions may itself present issues of real substance, and in circumstances where the constitutionality of a state statute is at stake, that undertaking itself may be one for a three-judge court. Whether that is the case here we need not decide.

That issue—the validity, in light of *Heller,* of the challenged application of the search warrant statutes—remained in the case after the *Miller II* dismissal. Indeed, although the District Court based its injunctive order on the unconstitutionality of the obscenity statutes, the injunction also interfered with the enforcement of the California search warrant statutes, necessarily on constitutional grounds.[15] With this question in the case, the three-judge court should have remained in session, as it did, and, as it also did, should have dealt with the *Younger* issue before reaching the merits of the constitutional issues presented. That issue, however, as we show in Part III, was not correctly decided.

---

[15] In *Aday* v. *Superior Court,* 55 Cal. 2d 789, 362 P. 2d 47 (1961), the California Supreme Court sustained use of a search warrant to effect a massive seizure of obscene books pending outcome of a criminal trial. The court rejected a First Amendment prior-restraint claim, referring to the obscene books as "contraband" and noting that this Court had allowed interim relief to the States in obscenity cases in order to "prevent frustration of judicial condemnation of obscene matter." Later decisions of this Court, *e. g., A Quantity of Books* v. *Kansas,* 378 U. S. 205 (1964), have undermined *Aday* insofar as it permits the State, absent a prior adversary hearing, to block the "distribution or exhibition," *Heller* v. *New York,* 413 U. S. 483, 492 (1973), of films or books by seizing them in greater quantities than is necessary for use as evidence in a criminal case or other judicial proceedings. However, in reversing the Municipal Court's suppression order, see *supra,* at 340–341, we take the Superior Court's reference to *Aday* to mean that the November seizures effected by search warrant were valid under that case and under the state statute once a prompt adversary hearing to determine obscenity is held, which hearing in its view would remove any constitutional objection under *Heller* v. *New York, supra,* to retention of more than one copy of "Deep Throat." The District Court's injunction nevertheless required the return of three of the seized films. We do not, of course, pass upon the merits of the reversal of the suppression order or the views expressed therein.

## B

Appellees contend (1) that under *Gonzalez* v. *Automatic Employees Credit Union,* 419 U. S. 90 (1974), and *MTM, Inc.* v. *Baxley,* 420 U. S. 799 (1975), the only injunctions issued by properly convened three-judge courts that are directly appealable here are those that three-judge courts alone may issue and (2) that the injunction finally issued on September 30 was not one that is reserved to a three-judge court under 28 U. S. C. § 2281. Even if appellees' premise is correct, but see *Philbrook* v. *Glodgett,* 421 U. S. 707, 712–713, n. 8 (1975), we cannot agree with the conclusion that the injunction entered here was not appealable. Not only was a state statute declared unconstitutional but also the injunctive order, as amended September 30, 1974, required appellants to seek the return of the three prints of "Deep Throat" which were the subject of nine of the 12 counts of the amended criminal complaint still pending in the Municipal Court. Return of the copies would prohibit their use as evidence and would, furthermore, prevent their retention and probable destruction as contraband should the State prevail in the criminal case. Plainly, the order interfered with the pending criminal prosecution and with the enforcement of a state obscenity statute. In the circumstances here, the injunctive order, issued as it was by a federal court against state authorities, necessarily rested on federal constitutional grounds. Aside from its opinion that the California statute was unconstitutional, the District Court articulated no basis for assuming authority to order the return of the films and in effect to negate not only three of the four seizures under state search warrants, which the Appellate Department of the Superior Court had upheld, but also the proceedings in the Superior Court that had declared the film to be obscene

and seizable.[16]   The District Court's June 4 opinion, we think, made its constitutional thesis express:

> "The gravamen of the defendants' justification is, of course, that the property is contraband, both the evidence and the fruit of an illegal activity.   Such a justification, however, dissipates in the face of a declaration by this court that the statute is invalid."

We accordingly conclude that the September 30 injunction, as well as the declaratory judgment underlying it, is properly before the Court.

### III

The District Court committed error in reaching the merits of this case despite the appellants' insistence that it be dismissed under *Younger* v. *Harris*, 401 U. S. 37 (1971), and *Samuels* v. *Mackell*, 401 U. S. 66 (1971). When they filed their federal complaint, no state criminal proceedings were pending against appellees by name; but two employees of the theater had been charged and four copies of "Deep Throat" belonging to appellees had been seized, were being held, and had been declared to be obscene and seizable by the Superior Court.   Appellees had a substantial stake in the state proceedings, so much so that they sought federal relief, demanding that the state statute be declared void and their films be returned to them.   Obviously, their interests and those of their employees were inter-

---

[16] The District Court noted that prosecution and defense counsel, following the suppression order in the Municipal Court, stipulated that the four copies would be deemed identical and only one copy need be proved.   However, the prosecution denied any agreement to return the suppressed films, successfully appealed the suppression order, and asserted that the District Court's order interfered with the prosecution of its case.   As we have said, the judgment of the District Court also interfered with the enforcement of the California search warrant statutes.

twined; and, as we have pointed out, the federal action sought to interfere with the pending state prosecution. Absent a clear showing that appellees, whose lawyers also represented their employees, could not seek the return of their property in the state proceedings and see to it that their federal claims were presented there, the requirements of *Younger* v. *Harris* could not be avoided on the ground that no criminal prosecution was pending against appellees on the date the federal complaint was filed. The rule in *Younger* v. *Harris* is designed to "permit state courts to try state cases free from interference by federal courts," 401 U. S., at 43, particularly where the party to the federal case may fully litigate his claim before the state court. Plainly, "[t]he same comity considerations apply," *Allee* v. *Medrano,* 416 U. S. 802, 831 (1974) (BURGER, C. J., concurring), where the interference is sought by some, such as appellees, not parties to the state case.

What is more, on the day following the completion of service of the complaint, appellees were charged along with their employees in Municipal Court. Neither *Steffel* v. *Thompson,* 415 U. S. 452 (1974), nor any other case in this Court has held that for *Younger* v. *Harris* to apply, the state criminal proceedings must be pending on the day the federal case is filed. Indeed, the issue has been left open; [17] and we now hold that where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of *Younger* v. *Harris* should apply in full force. Here, appellees were charged

---

[17] At least some Justices have thought so. *Perez* v. *Ledesma,* 401 U. S. 82, 117 n. 9 (1971) (BRENNAN, J., joined by WHITE and MARSHALL, JJ., concurring and dissenting). Also, *Steffel* v. *Thompson, supra,* did not decide whether an injunction, as well as a declaratory judgment, can be issued when no state prosecution is pending.

on January 15, prior to answering the federal case and prior to any proceedings whatsoever before the three-judge court. Unless we are to trivialize the principles of *Younger* v. *Harris*, the federal complaint should have been dismissed on the appellants' motion absent satisfactory proof of those extraordinary circumstances calling into play one of the limited exceptions to the rule of *Younger* v. *Harris* and related cases.[18]

The District Court concluded that extraordinary circumstances had been shown in the form of official harassment and bad faith, but this was also error. The relevant findings of the District Court were vague and conclusory.[19] There were references to the "pattern of

---

[18] Appellees also argue that dismissal under *Younger* v. *Harris* was not required because *People* v. *Enskat*, 33 Cal. App. 3d 900, 109 Cal. Rptr. 433 (1973), had settled the constitutional issue in the state courts with respect to the obscenity statute. But *Younger* v. *Harris* is not so easily avoided. State courts, like other courts, sometimes change their minds. Moreover, *People* v. *Enskat* was the decision of an intermediate appellate court of the State, and the Supreme Court of California could have again been asked to pass upon the constitutionality of the California statute. In any event, the way was open for appellees to present their federal issues to this Court in the event of adverse decision in the California courts.

[19] The June 4 opinion stated:

"Finally, the objective facts set forth in the first part of this opinion clearly demonstrate bad faith and harassment which would justify federal intervention. Any editorializing of those facts would serve no purpose. It is sufficient to note that the pattern of seizures of the plaintiffs' cash receipts and films demonstrate[s] that the police were bent upon a course of action that, regardless of the nature of any judicial proceeding, would effectively exorcise the movie 'Deep Throat' out of Buena Park."

Also, in the supplemental opinion of September 30, 1974, the District Court stated: "[T]he evidence brought to light by the petition for rehearing only serves to strengthen the previous finding of bad faith and harassment," observing only that no explanation had been offered for not instituting criminal proceedings against appellees

seizure" and to "the evidence brought to light by the petition for rehearing"; and the unexplicated conclusion was then drawn that "regardless of the nature of any judicial proceeding," the police were bent on banishing "Deep Throat" from Buena Park. Yet each step in the pattern of seizures condemned by the District Court was authorized by judicial warrant or order; and the District Court did not purport to invalidate any of the four warrants, in any way to question the propriety of the proceedings in the Superior Court,[20] or even to mention the reversal of the suppression order in the Appellate Department of that court. Absent at least some effort by the District Court to impeach the entitlement of the prosecuting officials to rely on repeated judicial authorization for their conduct, we cannot agree that bad faith and harassment were made out. Indeed, such conclusion would not necessarily follow even if it were shown that the state courts were in error on some one or more issues of state or federal law.[21]

---

until after the federal complaint was filed against them and that "[w]ithout such an explanation it is reasonable for the court to conclude that the institution of the criminal proceedings was in retaliation for the attempt by plaintiffs to have their constitutional rights judicially determined in this court."

[20] It has been noted that appellees did not appeal the Superior Court's order of November 27, 1973, declaring "Deep Throat" obscene and ordering all copies of it seized. It may be that under *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592 (1975), the failure of appellees to appeal the Superior Court order of November 27, 1973, would itself foreclose resort to federal court, absent extraordinary circumstances bringing the case within some exception to *Younger* v. *Harris*. Appellees now assert, seemingly contrary to their prior statement before Judge Ferguson, see n. 3, *supra*, that the November 27 order was not appealable. In view of our disposition of the case, we need not pursue the matter further.

[21] We need not, and do not, ourselves decide or intimate any opinion as to whether the Superior Court proceedings were, as claimed by appellees, unauthorized under California law.

352

In the last analysis, it seems to us that the District Court's judgment rests almost entirely on its conclusion that the California obscenity statute was unconstitutional and unenforceable. But even assuming that the District Court was correct in its conclusion, the statute had not been so condemned in November 1973, and the District Court was not entitled to infer official bad faith merely because it—the District Court—disagreed with *People* v. *Enskat*. Otherwise, bad faith and harassment would be present in every case in which a state statute is ruled unconstitutional, and the rule of *Younger* v. *Harris* would be swallowed up by its exception. The District Court should have dismissed the complaint before it and we accordingly reverse its judgment.

*So ordered.*

MR. CHIEF JUSTICE BURGER, concurring.

I join the opinion of the Court but I add a word about the composition of the three-judge District Court and the circumstances under which it was convened. Under 28 U. S. C. § 2284 (1) the district judge to whom the application for relief is presented, and who notifies the chief judge of the need to convene the three-judge court, "shall constitute one member of such court." It is well settled that "shall" means "must," cf. *Merced Rosa* v. *Herrero,* 423 F. 2d 591, 593 n. 2 (CA1 1970), yet the judge who called for the three-judge court here was not named to the panel. However, appellants made no timely objection to the composition of the court. *Ante,* at 338 n. 5. Obviously occasions can arise rendering it impossible for the district judge who initiates the convening of such a court under § 2284 (1) to serve on the court, but, in light of the unqualified mandatory language of the statute, when that occurs there is an obligation to

see to it that the record reveal, at the very least, a statement of the circumstances accounting for the substitution.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join, dissenting.

There are many aspects of the Court's opinion that seem to me open to serious challenge. This dissent, however, is directed only to Part III of the opinion, which holds that "[t]he District Court committed error in reaching the merits of this case despite the appellants' insistence that it be dismissed under *Younger* v. *Harris* . . . and *Samuels* v. *Mackell.* . . ."

In *Steffel* v. *Thompson,* 415 U. S. 452, the Court unanimously held that the principles of equity, comity, and federalism embodied in *Younger* v. *Harris,* 401 U. S. 37, and *Samuels* v. *Mackell,* 401 U. S. 66, do not preclude a federal district court from entertaining an action to declare unconstitutional a state criminal statute when a state criminal prosecution is threatened but not pending at the time the federal complaint is filed. Today the Court holds that the *Steffel* decision is inoperative if a state criminal charge is filed at any point after the commencement of the federal action "before any proceedings of substance on the merits have taken place in the federal court." *Ante,* at 349. Any other rule, says the Court, would "trivialize" the principles of *Younger* v. *Harris.* I think this ruling "trivializes" *Steffel,* decided just last Term, and is inconsistent with those same principles of equity, comity, and federalism.[1]

---

[1] There is the additional difficulty that the precise meaning of the rule the Court today adopts is a good deal less than apparent. What are "proceedings of substance on the merits"? Presumably, the proceedings must be both "on the merits" and "of substance." Does this mean, then, that months of discovery activity would be insufficient, if no question on the merits is presented to the court

There is, to be sure, something unseemly about having the applicability of the *Younger* doctrine turn solely on the outcome of a race to the courthouse. The rule the Court adopts today, however, does not eliminate that race; it merely permits the State to leave the mark later, run a shorter course, and arrive first at the finish line. This rule seems to me to result from a failure to evaluate the state and federal interests as of the time the state prosecution was commenced.

As of the time when its jurisdiction is invoked in a *Steffel* situation, a federal court is called upon to vindicate federal constitutional rights when no other remedy is available to the federal plaintiff. The Court has recognized that at this point in the proceedings no substantial state interests counsel the federal court to stay its hand. Thus, in *Lake Carriers' Assn.* v. *MacMullan,* 406 U. S. 498, we noted that "considerations of equity practice and comity in our federal system . . . have little force in the absence of a pending state proceeding." *Id.,* at 509. And in *Steffel,* a unanimous Court explained the balance of interests this way:

"When no state criminal proceeding is pending at

during that time? What proceedings "on the merits" are sufficient is also unclear. An application for a temporary restraining order or a preliminary injunction requires the court to make an assessment about the likelihood of success on the merits. Indeed, in this case, appellees filed an application for a temporary restraining order along with six supporting affidavits on November 29, 1973. Appellants responded on December 3, 1973, with six affidavits of their own as well as additional documents. On December 28, 1973, Judge Lydick denied the request for a temporary restraining order, in part because appellees "have failed totally to make that showing of . . . likelihood of prevailing on the merits needed to justify the issuance of a temporary restraining order." These proceedings, the Court says implicitly, were not sufficient to satisfy the test it announces. Why that should be, even in terms of the Court's holding, is a mystery.

the time the federal complaint is filed, federal intervention does not result in duplicative legal proceedings or disruption of the state criminal justice system; nor can federal intervention, in that circumstance, be interpreted as reflecting negatively upon the state court's ability to enforce constitutional principles. In addition, while a pending state prosecution provides the federal plaintiff with a concrete opportunity to vindicate his constitutional rights, a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." 415 U. S., at 462.

Consequently, we concluded that "[r]equiring the federal courts totally to step aside when no state criminal prosecution is pending against the federal plaintiff would turn federalism on its head." *Id.*, at 472. In such circumstances, "the opportunity for adjudication of constitutional rights in a federal forum, as authorized by the Declaratory Judgment Act, becomes paramount." *Ellis* v. *Dyson*, 421 U. S. 426, 432. See also *Huffman* v. *Pursue, Ltd.*, 420 U. S. 592, 602–603.

The duty of the federal courts to adjudicate and vindicate federal constitutional rights is, of course, shared with state courts, but there can be no doubt that the federal courts are "the primary and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States." F. Frankfurter & J. Landis, The Business of the Supreme Court: A Study in the Federal Judicial System 65 (1927). The statute under which this action was brought, 42 U. S. C. § 1983, established in our law "the role

of the Federal Government as a guarantor of basic federal rights against state power." *Mitchum* v. *Foster,* 407 U. S. 225, 239. Indeed, "[t]he very purpose of § 1983 was to interpose the federal courts between the States and the people." *Id.,* at 242. See also *Zwickler* v. *Koota,* 389 U. S. 241, 245, 248; *McNeese* v. *Board of Education,* 373 U. S. 668; *Monroe* v. *Pape,* 365 U. S. 167. And this central interest of a federal court as guarantor of constitutional rights is fully implicated from the moment its jurisdiction is invoked. How, then, does the subsequent filing of a state criminal charge change the situation from one in which the federal court's dismissal of the action under *Younger* principles "would turn federalism on its head" to one in which *failure* to dismiss would "trivialize" those same principles?

A State has a vital interest in the enforcement of its criminal law, and this Court has said time and again that it will sanction little federal interference with that important state function. *E. g., Kugler* v. *Helfant,* 421 U. S. 117. But there is nothing in our decision in *Steffel* that requires a State to stay its hand during the pendency of the federal litigation. If, in the interest of efficiency, the State wishes to refrain from actively prosecuting the criminal charge pending the outcome of the federal declaratory judgment suit, it may, of course, do so. But no decision of this Court requires it to make that choice.

The Court today, however, goes much further than simply recognizing the right of the State to proceed with the orderly administration of its criminal law; it ousts the federal courts from their historic role as the "primary reliances" for vindicating constitutional freedoms. This is no less offensive to "Our Federalism" than the federal injunction restraining pending state criminal proceedings condemned in *Younger* v. *Harris.* The concept of federalism requires "sensitivity to the legitimate interests

of *both* State and National Governments." 401 U. S., at 44 (emphasis added). *Younger* v. *Harris* and its companion cases reflect the principles that the federal judiciary must refrain from interfering with the legitimate functioning of state courts. But surely the converse is a principle no less valid.

The Court's new rule creates a reality which few state prosecutors can be expected to ignore. It is an open invitation to state officials to institute state proceedings in order to defeat federal jurisdiction.[2] One need not impugn the motives of state officials to suppose that they would rather prosecute a criminal suit in state court than defend a civil case in a federal forum. Today's opinion virtually instructs state officials to answer federal complaints with state indictments. Today, the State must file a criminal charge to secure dismissal of the federal litigation; perhaps tomorrow an action "akin to a criminal proceeding" will serve the purpose, see *Huffman* v. *Pursue, Ltd., supra;* and the day may not be far off when any state civil action will do.

The doctrine of *Younger* v. *Harris* reflects an accommodation of competing interests. The rule announced today distorts that balance beyond recognition.

---

[2] The District Court found that the filing of the state criminal complaint, six weeks after the State had appeared to oppose the appellees' application for a temporary restraining order but only a day after service of the complaint was effected, "would seem to supply added justification" for its finding of harassment. The court concluded "that the institution of the criminal proceedings was in retaliation for the attempt by plaintiffs to have their constitutional rights judicially determined in this court."