**Hilda MORGAN et al., Plaintiffs,**

v.

**Edward W. MAHER, Individually and in his official capacity as Commissioner of the Department of Social Services, State of Connecticut, Defendant.**

Civ. No. N–76–12.

United States District Court,
D. Connecticut.

March 20, 1978.

Richard McCarthy, Connecticut Legal Services, Inc., Bridgeport, Conn., for plaintiffs.

Paige Everin, Asst. Atty. Gen., State of Connecticut, Hartford, Conn., for defendant.

## MEMORANDUM AND ORDER

DALY, District Judge.

Plaintiffs are recipients of public assistance under the joint federal and state program of Aid to Families with Dependent Children (AFDC).[1]  42 U.S.C. § 601 et seq.

---

1. Plaintiffs represent a class of recipients under the Aid to Families with Dependent Children program who have not been convicted of defrauding the Connecticut Department of Social

They have moved for summary judgment claiming that the procedures followed by the Connecticut Department of Social Services in replacing lost, stolen, or misplaced AFDC checks violate the "reasonable promptness" standard of 42 U.S.C. § 602(a)(10), and are therefore invalid under the Supremacy Clause.[2] In response, the defendant also requests summary judgment.

## AFDC PROCEDURES

Payments under the AFDC program are mailed to recipients twice monthly from the Department's central office in Hartford. More than 100 AFDC checks are lost, stolen, or misplaced each month. When a recipient reports to a local office that a check has not arrived on schedule, the recipient is advised to renew the request for a replacement if the check is not received on the third post-office working day after the check was due to arrive. This interim period ensures that merely delayed checks will not be replaced.

If the request for a replacement is renewed after the waiting period has elapsed, the local office prepares an affidavit for the recipient to sign stating that he or she has not received the check. The local office also completes an authorization form for a replacement check. Both the signed affidavit and the replacement authorization form are then mailed to the central office. The central office is also notified by telephone of the missing check.

In response to the telephone call, the central office first determines whether the check had never been mailed or had been returned by the post office. If the check is not at the central office, the bank is notified to stop payment. The bank then determines whether the check has been cashed. If the check has not been cashed, the central office will mail a replacement directly to the recipient upon receipt of the affidavit and the local office authorization.

If the bank responds that the stop-payment order cannot be honored because the check has already been cashed, the central office will wait for the return of the original check before taking further action. When the check finally arrives at the central office, and the signature of the recipient appears on the back of the original, a copy of the original check is then mailed to the local office. If the signature does not appear to be the recipient's, a copy of the check, along with a replacement check, is mailed to the local office. The recipient is then confronted with the copy at the local office. If the recipient continues to maintain that the original check was not received, the local office may turn over the replacement check or, if necessary, notify the central office to issue a new check. According to statistics offered by the plaintiffs and not disputed by the defendant, in nearly sixty percent of the cases delays of more than twenty-nine days occur between the original due date of the check and the date a replacement is mailed. About fifteen percent of all replacement checks are mailed at least sixty days after the original check was due.

Subsequent to the commencement of this suit, Connecticut established the Emergency Assistance Food Program for Needy AFDC Families with Children. Under this program, families whose AFDC check is missing are entitled to receive food vouchers if they are, or will be, without food as a result. The recipient who has requested emergency assistance must observe the three-day waiting period to allow for a de-

Services, to whom the defendant has mailed or will mail an AFDC check which the recipient has not or will not receive, and to whom the defendant has failed or will fail to provide a replacement.

**2.** Jurisdiction is based on 28 U.S.C. § 1343(3) & (4) (1970). Count II of the complaint is not involved in the Motion for Summary Judgment, and raises a due process challenge to the check replacement process. Because this constitutional claim is not unsubstantial, nor wholly without merit, jurisdiction is proper. *Hagans v. Lavine,* 415 U.S. 528, 534–39, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974). The Supremacy Clause claim thus may be considered under this Court's pendent jurisdiction. *Id.* at 543, 94 S.Ct. 1372. *See Lynch v. Philbrook,* 550 F.2d 793, 795 (2d Cir. 1977).

lay in receiving the regular AFDC check. If the request is then renewed, an emergency voucher is issued. The voucher allows the recipient to purchase what is regarded as five-days worth of food, and can be issued only once in every sixty-day period. Mismanagement of funds, e. g., non-payment of rent or utilities, will justify only a single emergency payment to a particular family, although "excess utilities" may be considered in providing repeat assistance.[3] There is no provision for deducting these emergency payments from the replacement check or from later AFDC checks received in the normal course.[4] One who has been denied emergency assistance may request a hearing. Connecticut Department of Social Services, Manual Vol. 1, No. 5070, at 1 (Sept. 26, 1977).

## DISCUSSION

The requirement of "reasonable promptness" embodied in section 602(a)(10) was enacted by Congress to prevent the states from establishing waiting lists of eligible welfare recipients in order to delay assistance and thus relieve the fiscal pressure upon the state program. *Jefferson v. Hackney,* 406 U.S. 535, 545, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). This provision thus

prohibits unreasonable delays in providing assistance to eligible recipients. Plaintiffs argue that in order to comply with this Congressional mandate Connecticut must 1) provide emergency assistance immediately upon notification that an AFDC check is missing in an amount sufficient to cover food expenses for the period between the time the check was reported missing and the arrival date of the next regularly scheduled check, and 2) replace the missing check within two weeks of the date that the recipient has signed a replacement affidavit.

In support of the plaintiffs' request, they cite *Randle v. Weaver,* No. 71 C 1359 (N.D.Ill. Jan. 30, 1974), *aff'd,* 419 U.S. 1028, 95 S.Ct. 509, 42 L.Ed.2d 304 (1974). In that case, a three-judge court entered an order including relief identical to that requested by the present plaintiffs.[5] A summary affirmance binds all lower courts. *Hicks v. Miranda,* 422 U.S. 332, 343–346, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); *see generally Colorado Springs Amusements, Ltd. v. Rizzo,* 428 U.S. 913, 96 S.Ct. 3228, 49 L.Ed.2d 1222 (1976) (denial of certiorari) (Brennan, J., dissenting). To determine whether *Randle* serves as binding precedent, the "reach and content" of the summary affirmance in that case must be compared to the present

3. If investigation by the local office reveals that the emergency arises from the non-payment of rent and/or utilities for at least two months, a referral to a preventive or protective worker is required.

4. The plaintiffs do not allege federal financial support for the emergency assistance program. State emergency programs that are supported by federal funds must comply with federal guidelines. *See* 42 U.S.C. §§ 603(a)(5), 606(e), (1970). If the program was federally funded, the payment of emergency assistance would have to be "forthwith". 45 C.F.R. § 233.-120(a)(5) (1976). *See Adens v. Sailer,* 312 F.Supp. 923 (E.D.Pa.1970). Recoupment of payments made under the program would be prohibited. *Davis v. Smith,* 431 F.Supp. 1206, 1210–13 (S.D.N.Y.1977). And any definition of eligibility narrower than that provided under the Social Security Act would be invalid. *Lynch v. Philbrook, supra* note 2; *Williams v. Wohlgemuth,* 540 F.2d 163 (3d Cir. 1976).

5. *See also Randle v. Swank,* 53 F.R.D. 577 (N.D.Ill.1971). In a case preceding the Supreme Court decision in *Randle,* a district court in *Copeland v. Parham,* 330 F.Supp. 383 (N.D. Ga.1971), upheld as reasonable the replacement of an AFDC check within a few days after the loss was reported if it was determined that the check had not been cashed, and the replacement of a check within two weeks if the check had been cashed. *Cf. Cornelius v. Minter,* 395 F.Supp. 616 (D.Mass.1974) (delays of two to six months in providing financial and supportive services held violative of § 602(a)(10)). On appeal, the Fifth Circuit affirmed per curiam, treating the issue solely as a question of due process and without mentioning the "reasonable promptness" standard of § 602(a)(10). Also, the periods of delay noted in the Circuit opinion were longer than those detailed by the lower court. A delay of 15 days in replacing checks that had not been cashed, and a delay of 45 days when the check had been cashed, were found reasonable. *Copeland v. Saucier,* 475 F.2d 1127 (5th Cir. 1973).

facts. *Hicks v. Miranda, supra,* 422 U.S. at 345 n.14, 95 S.Ct. 2281.[6]

The meaning of the Supreme Court's decision in *Randle* is best defined by the appellant's jurisdictional statement and the respondent's reply papers. *See Cantor v. Detroit Edison Co.,* 428 U.S. 579, 617 n.5, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Stewart, J., dissenting); *Port Authority Bondholders Protective Committee v. Port of New York Authority,* 387 F.2d 259, 260 (2d Cir. 1967) (Friendly J.). The appellants listed four issues in their jurisdictional statement, including the applicability of the Social Security Act and accompanying regulations to the check replacement process. Jurisdictional Statement, at 3, 14–15. The appellants also challenged the lower court's finding that the Illinois practices were unreasonable. *Id.* at 3, *et passim.*[7] Thus the legal standard of "reasonable promptness" under section 602(a)(10) served as the measuring rod in that case as well as in the present suit. The plaintiffs in *Randle* had available in the interim between the loss of the check and the arrival of a replacement, as do the plaintiffs here, emergency assistance amounting to a small portion of the missed payment. *Id.* at 5; Respondents' Motion to Dismiss, at 9–10. Furthermore, in both cases the delay was in part due to the perceived need to conduct an investigation prior to replacement. Jurisdictional Statement, at 13. *But see* Respondents' Motion to Dismiss, at 10.

Although the two cases share essential elements, this Court is unwilling to consider the Supreme Court's summary affirmance of *Randle* conclusive. Chief Justice Burger has warned that "[w]hen we summarily affirm, without opinion, the judgment of a three-judge District Court we affirm the judgment but not necessarily the reasoning by which it was reached." *Fusari v. Steinberg,* 419 U.S. 379, 391, 95 S.Ct. 533, 541, 42 L.Ed.2d 521 (1975) (concurring opinion). In *Randle,* an articulation of the rule of the case becomes even more speculative because there is no lower court opinion. In addition, the question of "reasonable promptness" involves a balancing of the harm caused by delayed replacements against the administrative necessities of more gradual action. The decision requires a case-by-case analysis with due regard for an individual state's experience with assistance programs, the character of the recipient group, the justifications asserted by the state, and the availability of other temporary relief.[8] The *Randle* affirmance is conclusive as to the *potential* reach of section 602(a)(10); at least in some circumstances, the order requested by the plaintiffs would be proper. Unquestioning adoption of the court order in *Randle,* however, is inadvisable. *Cf. Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977) (per curiam). As a result, this Court must make its own determination whether similar relief is warranted in this case, *i. e.,* whether the harm to the petitioner outweighs the administra-

---

**6.** For a discussion of the difficulties of interpreting summary action by the Supreme Court, see Note, *Summary Dispositions of Supreme Court Appeals: The Significance of Limited Discretion and a Theory of Limited Precedent,* 52 B.U.L.Rev. 373 (1972).

**7.** The appellants argued that the court-ordered relief was unnecessary and unreasonable, as well as a usurpation of administrative functions. Jurisdictional Statement, at 3, 15–20. Although the Jurisdictional Statement did not directly challenge the lower court's finding that the procedures followed by Illinois were unreasonable under § 602(a)(10), that issue surfaces throughout the statement. Respondents' brief noted the veiled aspect of the appellants' argument, stating that "an examination of the text . . . reveals they devote most of it to de-

fending the reasonableness of their actions and not to the issue they purport to raise." Respondents' Motion to Dismiss, at 6. The abbreviated memorandum of the United States as amicus curiae, which was submitted at the request of the Court, recommended affirmance of the lower court order and noted that "[t]he uncontested facts indicate that in at least some cases, aid was not being furnished with reasonable promptness. . . ." Memorandum for the United States as Amicus Curiae, at 1.

**8.** "Any statutory requirement that embodies notions of timeliness, accuracy, and administrative feasibility inevitably will generate fact-specific applications." *Fusari v. Steinberg,* 419 U.S. 379, 388 n.15, 95 S.Ct. 533, 539, 42 L.Ed.2d 521 (1975).

tive problems caused by the plaintiffs' proposal.

In the context of due process protections against the undeserved cessation of welfare benefits, the Supreme Court has noted that the "crucial factor" is that termination of aid pending resolution of a controversy over eligibility "may deprive an *eligible* recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation immediately becomes desperate." *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). The situation of the welfare recipient who has missed an AFDC payment is similar.[9] Because the recipient is, by definition, living on a subsistence level, a single lost payment will impact directly upon the availability of essential services—food, utilities, and housing. Furthermore, the general public has an interest in the well-being of the poor, and "[t]he same governmental interests that counsel the provision of welfare, counsel as well its uninterrupted provision to those eligible to receive it . . . ." *Id.* at 265, 90 S.Ct. at 1019. Connecticut's emergency assistance program lessens the trauma of a delayed AFDC replacement check, but does not remedy it. The form of relief is limited, and does not take into consideration the possible loss of multiple checks during the same sixty-day period. Finally, the emergency program has been discontinued once already since its inception

in early 1977, and thus there is no reason to expect the program to continue without further interruptions.[10] Therefore, even in light of Connecticut's emergency assistance program, the harm to AFDC recipients caused by the delayed replacement may still be great.[11]

■ The inquiry must now turn to the administrative justifications for the challenged delays in replacing AFDC checks. Federal regulations require that "[f]inancial assistance . . . included in the [state] plan shall be furnished promptly to eligible individuals without delay attributable to the agency's administrative process, and shall be continued regularly to all eligible individuals until they are found to be ineligible." 45 C.F.R. § 206.10(a)(5) (1976). This provision, in conjunction with the "reasonable promptness" mandate of section 602(a)(10), prohibits unnecessary delays in the delivery of assistance.[12] The defendant argues that the delays in replacing AFDC checks are essential to an adequate investigation. The defendant's premise is that investigations are themselves necessary *before* the replacement check is paid. The facts, however, suggest otherwise. According to the records of the Department of Social Services, a replacement check is issued in nearly every case. There is little indication that fraud is a frequent occurrence, or, in the alternative, that an investigation as presently conducted would uncov-

---

9. *See Cornelius v. Minter,* 395 F.Supp. 616, 621 (D.Mass.1974).

10. The emergency food program had been available from January 21 to August 1, 1977, but was discontinued. The program was renewed by Conn.Pub. Act No. 77–449 (June 20, 1977), and assistance again became available on October 1, 1977. Connecticut Department of Social Services, Bull. No. 2980 (Sept. 26, 1977).

11. Defendants argue that the delays in this case are generally no worse than those approved for processing AFDC applications. *See* 45 C.F.R. § 206.10(a)(3) (1976); *Class v. Norton,* 507 F.2d 1058 (2d Cir. 1974). The analogy, however, is unconvincing. First, many applicants for assistance are eventually found ineligible, while a replacement check is sent to most of those who request it, therefore the role played by the investigative process is more

important in the context of eligibility determinations. Also, the application process is more complex and thus requires more time to complete. Finally, established recipients of AFDC assistance constitute the "certified poor," a group whose need for assistance is generally greater and more immediate.

12. *Cf. California Human Resources Dep't v. Java,* 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971). *Java* dealt with § 303(a)(1) of the Social Security Act, 42 U.S.C. § 503(a)(1) (1970), which required that a state administered unemployment insurance program be "reasonably calculated to insure full payment of unemployment compensation when due." The Supreme Court interpreted the section to mean assistance must be provided "at the earliest point that is administratively feasible." *Id.* at 135, 91 S.Ct. at 1356.

er it. The defendant's argument is thus reduced to the assertion that investigation constitutes, at best, a deterrent to those who might otherwise submit fraudulent claims.

If the investigative steps are looked upon as a deterrent, however, it would seem to make little difference whether the investigation is conducted before or after the check is replaced, as long as there is some means to recoup a wrongful payment. It is clearly within the state's authority to recoup fraudulently induced payments through regular deductions from subsequent AFDC checks. The only limitation on recoupment is that it be done with due consideration for the effect of the reduction on the recipients. *See* 45 C.F.R. § 233.-20(a)(12)(f) (1976); *Gardenia v. Norton*, 425 F.Supp. 922 (D.Conn.1976); *cf. Hagans v. Berger*, 536 F.2d 525 (2d Cir. 1976). Therefore the possibility of unrecoverable payments is minimal. Similarly, accepting the defendant's estimation of the importance of an investigation, the instances in which recoupment will prove necessary are likely to be few.

■ Weighing the interests of the eligible recipient in uninterrupted assistance and rapid replacement of missing checks against the administrative necessities of Connecticut's AFDC program, this Court concludes that the delays in the present replacement process violate the "reasonable promptness" standard of section 602(a)(10) of the Social Security Act.[13] Furthermore, this Court considers warranted the specific relief requested by the plaintiffs—the replacement of a lost, stolen, or misplaced AFDC check within fourteen days after the recipient has signed an affidavit averring that he or she has not received the check, and the delivery of emergency assistance at the time the check is reported missing to cover the recipient's food needs for the period between the day the original check was supposed to arrive and the day the next AFDC check is due.[14] In most cases, the only added administrative burden will be the deduction of emergency payments from subsequent checks. This burden is clearly outweighed by the interest of the recipients in uninterrupted support. Finally, it should be noted that administrative barriers, as well as the frequency of fraud, are not constant factors; the rule of "reasonable promptness" is flexible and must be adjusted in the light of experience. At this point in the AFDC program, the relief requested by the plaintiffs is proper.[15] The plaintiffs' motion for summary judgment is GRANTED.

Accordingly, to ensure that the plaintiffs are provided with Aid to Families with Dependent Children with "reasonable promptness" as required by the Social Security Act, 42 U.S.C. § 602(a)(10), this Court hereby enters the following ORDER:

1. The defendant shall replace an AFDC check within fourteen days from the date of a replacement request made by a recipient

13. In *Barrett v. Roberts*, 551 F.2d 662 (5th Cir. 1977), the Court of Appeals upheld as reasonable under § 602(a)(10) a delay of eight to 20 days in providing a monthly AFDC check due while termination procedures have commenced and the recipient has requested a hearing. The Court of Appeals did not cite the Supreme Court's affirmance of *Randle*. Furthermore, the Court remanded specifically for the purpose of determining whether more rapid procedures were feasible, thus holding that § 602(a)(10) may require a shorter period of delay in light of administrative realities. *Id.* at 671.

14. If during the two-week period the check has been cashed and it is clear that the recipient was responsible, the replacement need not be made. This Court's ruling does not preclude other measures by the state to improve the delivery of assistance. For example, to minimize the possibility of double payments, the state might establish a time period within which thefts or losses must be reported. Such a rule would aid the state's efforts to stop payment on the original check. Also, rather than issue emergency assistance, the state might provide a replacement check immediately, subject to later recoupment if necessary.

15. The relief requested by the plaintiffs may become a mixed blessing. The limited emergency aid drawn from purely state funds is not presently recoupable. Expedited assistance under § 602(a)(10), however, may be deducted from subsequent checks. This Court's ruling may encourage the discontinuation of the state program.

who has not previously made a fraudulent representation in relation to the receipt of public assistance; and

2. The defendant shall provide emergency assistance for AFDC recipients who seek replacement of their missing checks in an amount sufficient to purchase food for the period between the time the check was supposed to arrive and the date of arrival of the next check, taking into consideration the availability of assistance from existing state programs. This assistance shall be granted at the time the recipient reports the check is missing. This emergency assistance shall include a procedure whereby recipients can purchase their monthly allotment of food stamps if necessary.

3. For purposes of this order, (a) the date of replacement shall be the date defendant mails the replacement check to the recipient or the date defendant makes available at a location convenient to the recipient a replacement check for pick-up by the recipient or the recipient's authorized representative; (b) the "date of a replacement request" shall be the date the recipient files a signed replacement request form with the defendant stating that the AFDC check is missing; (c) an AFDC check is "missing" if it has not been received for at least four post-office working days from the mailing date.

SO ORDERED.