Susan Lynn VORCHHEIMER, by her parents Bert and Carol Vorchheimer; guardians ad litem on her own behalf and on behalf of all others similarly situated, Plaintiffs-Appellees,

v.

SCHOOL DISTRICT OF PHILADELPHIA and Matthew W. Costanzo, Superintendent of the School District of Philadelphia, Defendants-Appellants.

No. 75–2005.

United States Court of Appeals, Third Circuit.

Argued Oct. 31, 1975.

Decided March 16, 1976.

Alan H. Gilbert, Philadelphia, Pa., for defendants-appellants.

Sharon K. Wallis, Eleanor Flick, Philadelphia, Pa., for plaintiffs-appellees.

Before GIBBONS, Circuit Judge, MARKEY,* Chief Judge of Court of Customs and Patent Appeals, and WEIS, Circuit Judge.

## OPINION OF THE COURT

JOSEPH F. WEIS, Jr., Circuit Judge.

Do the Constitution and laws of the United States require that every public school, in every public school system in the Nation, be coeducational? Stated another way, do our Constitution and laws forbid the maintenance by a public school board, in a system otherwise coeducational, of a limited number of single-sex high schools in which enrollment is voluntary and the educational opportunities offered to girls and boys are essentially equal? This appeal presents those questions and, after careful consideration, we answer negatively. Accordingly, we vacate the district court's judgment which held that the school board policy was impermissible.[1]

Plaintiff is a teen-age girl who graduated with honors from a junior high school in Philadelphia. She then applied to Central High School, a public school in the city, but was refused admission because that institution is restricted to male students. After that setback, she filed this class action in the United States District Court seeking relief under 42 U.S.C. § 1983 from alleged unconstitutional discrimination. After a trial, the district court granted an injunction, ordering that she and other qualified female students be admitted to Central.

The Philadelphia School District offers four types of senior high schools: academic, comprehensive, technical and magnet. Although this suit is aimed at only an academic school, it is necessary to review the roles of other schools as well.

Comprehensive schools provide a wide range of courses, including those required for college admission, and offer advanced placement classes for students who are intellectually able to progress at a faster than average rate. The criterion for enrollment in the comprehensive schools is residency within a designated area. Although most of these schools are co-ed, two admit only males and one is restricted to female students. At the time the injunction was granted, plaintiff was enrolled at George Washington High School, a coeducational comprehensive school.

Academic high schools have high admission standards and offer only college preparatory courses. There are but two such schools in Philadelphia, and they accept students from the entire city rather than operating on a neighborhood basis. Central is restricted to males, and Girls High School, as the name implies, admits only females.

Central High School was founded in 1836 and has maintained a reputation for academic excellence. For some years before 1939, it was designated a comprehensive rather than an academic high school as it is presently. Its graduates both before and after 1939 have made notable contributions to the professions, business, government and academe.

Girls High has also achieved high academic standing. It was founded in 1848 and became an academic school in 1893. Its alumnae have compiled enviable records and have distinguished themselves in their chosen diverse fields. It now has a faculty of more than 100 and a student body of approximately 2,000, about the same as those of Central.

Enrollment at either school is voluntary and not by assignment. Only 7% of students in the city qualify under the stringent standards at these two schools, and it is conceded that plaintiff met the scholastic requirements of both. The Philadelphia school system does not have a co-ed aca-

---

* Sitting by designation.

1. The district court's opinion is published at 400 F.Supp. 326 (E.D.Pa.1975).

demic school with similar scholastic requirements for admission.

The courses offered by the two schools are similar and of equal quality. The academic facilities are comparable, with the exception of those in the scientific field where Central's are superior. The district court concluded "that [generally] the education available to the female students at Girls is comparable to that available to the male students at Central." Moreover, "[g]raduates of both Central and Girls High, as well as the other senior high schools of Philadelphia," have been and are accepted by the most prestigious universities.

The plaintiff has stipulated that "the practice of educating the sexes separately is a technique that has a long history and world-wide acceptance." Moreover, she agrees that "there are educators who regard education in a single-sex school as a natural and reasonable educational approach." In addition to this stipulation, the defendants presented the testimony of Dr. J. Charles Jones, an expert in the field of education. Dr. Jones expressed a belief, based on his study of New Zealand's sex-segregated schools, that students in that educational environment had a higher regard for scholastic achievement and devoted more time to homework than those in co-ed institutions. The district judge commented that even had the parties not stipulated to the educational value of the practice, "this Court would probably have felt compelled to validate the sex-segregated school on the basis of Dr. Jones' hypotheses concerning the competition for adolescent energies in a coed school and its detrimental effect on student learning and academic achievement."[2]

Before deciding which school she wished to attend, the plaintiff visited a number of them and developed some definite opinions.

As to Girls High, she commented, "I just didn't like the impression it gave me. I didn't think I would be able to go there for three years and not be harmed in any way by it." As to Central, she said, "I liked it there. I liked the atmosphere and also what I heard about it, about its academic excellence." She was somewhat dissatisfied with her education at George Washington High School because of her belief that the standards which the teacher set for the students were not high enough.[3]

The trial judge found the gender based classification of students at the two schools to lack a "fair and substantial relationship to the School Board's legitimate interest" and enjoined the practice.

The court's factual finding that Girls and Central are academically and functionally equivalent establishes that the plaintiff's desire to attend Central is based on personal preference rather than being founded on an objective evaluation.

A fair summary of the parties' positions, therefore, is that:

1. the local school district has chosen to make available on a voluntary basis the time honored educational alternative of sexually-segregated high schools;

2. the schools for boys and girls are comparable in quality, academic standing, and prestige;

3. the plaintiff prefers to go to the boys' school because of its academic reputation and her personal reaction to Central. She submitted no factual evidence that attendance at Girls High would constitute psychological or other injury;

4. the deprivation asserted is that of the opportunity to attend a specific school, not that of an opportunity to obtain an education at a school with

2. 400 F.Supp. at 335. The defendants also relied on the testimony of Dr. M. Elizabeth Tidball who studied the educational background of those recognized in Who's Who of American Women. She found that the percentage of those listed was higher for graduates of women's colleges than for those of co-ed schools.

3. In an affidavit accompanying a Motion to Dissolve Stay Pending Appeal, the plaintiff stated that at the end of the eleventh grade at George Washington, she would qualify for early admission to college.

comparable academic facilities, faculty and prestige.

With this factual background, we now turn to a review of the legal issues. We look first to federal statutory law to determine if it resolves the question raised here.

The financial assistance granted to educational institutions by the federal government has led to its ever-increasing influence in a field which in times past was considered the domain of state, local or private activity. It is not surprising that gender based admission standards have been the subject of Congressional deliberation.

In 1972 Congress provided that the benefits of educational programs funded through federal monies should be available to all persons without discrimination based on sex. 20 U.S.C. §§ 1681 *et seq.* The statute applies, however, to only specified types of educational institutions and excludes from its coverage the admission policies of secondary schools.[4] The bill which passed the House applied to all educational establishments and, if it had become law, would have required that all single-sex schools, primary and secondary, public and private, become coeducational.

However, the Senate proposal, which was the one enacted, eliminated these provisions for reasons which became apparent during debate on the measure. On the floor of the Senate, Senator Bayh offered an amendment to restrict the application of the Act. He explained:

"As my colleagues know, a similar amendment on the House side was the center of some controversy because many felt that the admissions policies of too many schools were covered without sufficient study and debate. Because of the time pressures on the House side, long preparation was not possible. One result of the House approach is that all single-sex elementary and secondary institutions of education—both public and private— would be required to become coeducational. While this may be a desirable goal, no one even knows how many single-sex

schools exist on the elementary and secondary levels or what special qualities of the schools might argue for a continued single sex status." 118 Cong.Rec. 5804 (February 28, 1972).

\* \* \* \* \* \*

"In any event, I believe specific hearings are needed to answer these questions which had not been raised at the time of the 1970 hearings. Since there are also a number of high schools which are single sex, a similar study is needed on the question of requiring them to admit students of both sexes. I have been amazed to learn that the Office of Education does not even keep statistics on how many elementary and secondary schools—even public schools—are restricted in admissions to one sex. After these questions have been properly addressed, then Congress can make a fully informed decision on the question of which—if any—schools should be exempted." 118 Cong.Rec. at 5807 (February 28, 1972).

For further discussion *see* the Senate debate at 118 Cong.Rec. 5803–5815 (February 28, 1972). These narrowing provisions of the amendment became a part of the Act as it was finally passed by Congress. *See* 20 U.S.C. § 1681(a)(1)–(5).

During that same year, the House passed HB 13915 entitled "The Equal Educational Opportunities Act," legislation aimed against busing as a means of securing racial balance in schools. The original bill, which was referred to committee, contained no reference to discrimination based on sex, and the hearings were devoted to testimony on the busing issue. For reasons not explained in the committee report, the word "sex" was added in certain parts of the bill. The summary of the bill as it was reported out of committee included these comments:

"*Section 2. Policy and purpose*

Subsection (a) of this section declares it to be the policy of the United States that all public school children are entitled to equal educational opportunity without re-

---

4. Moreover, there is a specific exclusion of the admissions policies of public colleges which traditionally enrolled only students of one sex. 20 U.S.C. § 1681(a)(5).

gard to race, color, sex or national origin

\*   \*   \*   \*   \*   \*

"*Section 3.* Findings

Subsection (a) contains a number of congressional findings:

(1) the maintenance of dual school systems where pupil assignments are made solely on the basis of race, color, sex, or national origin denies the equal protection of the laws." H.Rep.No.92–1335, 92d Cong., 2d Sess., 9 (1972).

These provisions were eventually incorporated into the Act as passed by the House.

Facially, these sections conceivably could indicate a determination by the House that one-sex schools should not continue. However, a review of the House proceedings shows some unexplained and curious deviations between pertinent sections of the bill as described in the committee report and as actually reported out and finally passed. Representative Pucinski, a sponsor of the bill, presented the summary from the committee report on the floor of the House before debate began, including the following:

"*Section 201. Denial of equal educational opportunity prohibited .*

"This section prohibits a State from denying equal educational opportunity to an individual on account of race, color, sex, or national origin by—

(1) deliberate segregation by educational agencies on the basis of race, color, *sex,* or national origin among or within the schools;

\*   \*   \*   \*   \*   \*

(5) transfer by educational agencies of students from one school to another if the purpose and effect is to increase segregation of students on the basis of race, color, *sex,* or national origin   .   .   ." 118 Cong.Rec. 28837 (August 17, 1972). (Emphasis supplied)

Significantly, the word "sex" at the points we have italicized it in the text had already been deleted from the bill and in that form it passed the House and was sent to the Senate. An examination of the legislative history and record of debate affords no explanation for these important deletions. After extended debate in the Senate, the bill was defeated.

In 1974, during House debate on HR 69, a bill to extend and amend the Elementary and Secondary Education Act of 1965, Representative Esch, an advocate of the Equal Educational Opportunities Act of 1972, proposed an amendment identical in relevant portions with that Act. The amendment was adopted and HR 69, after modifications in the Senate not pertinent to our discussion, was enacted into law. 20 U.S.C. §§ 1701–1721.

The result is an anomaly. In an early part of the enactment, Congress finds that maintenance of dual school systems in which students are assigned solely on the basis of sex denies equal protection. 20 U.S.C. § 1702(a)(1). Despite that policy pronouncement, however, the statute does not prohibit the states from segregating schools on the basis of sex although there is a specific proscription on segregation based on race, color or national origin. 20 U.S.C. § 1703(a). Insofar, then, that the Equal Educational Opportunities Act of 1974 might have application to established single-sex schools, the legislation is at best ambiguous.

An explanation for the lack of clarity may be found in the context of congressional concerns at the time. The debates in the House and Senate, both in 1972 and in 1974, demonstrate that Congress was completely absorbed by the highly emotional issues generated by busing to achieve racial integration. Questions of constitutionality and policy as they applied to the busing problem pre-occupied the speakers. Not once during the extended and heated discussions was there any reference to single-sex schools.[5]

5. At one point, Representative Anderson introduced a substitute for Mr. Esch's amendment which did not contain the word "sex." The amendment varied, however, in other points considered more significant at the time and was defeated, again without any suggestion that the deletion of discrimination on account of sex was a consideration. *See* 120 Cong.Rec.

An analysis of the statutory language, which recognizes the background to the legislative effort, is helpful. Congress' finding as to "the maintenance of dual school systems in which students are assigned to schools solely on the basis of race, color, sex . . . ." should be read in the light of the policies followed by many communities to avoid racial integration. It is at least questionable that Philadelphia maintains a "dual school system" and the application of this phraseology to the case at bar is dubious.

■ The Act's policy declaration is that children are entitled to "equal educational opportunity" without regard to race, color, or sex. The finding of the district court discloses no inequality in opportunity for education between Central and Girls High Schools. We cannot, therefore, find that language applicable here.

Section 204(c), 20 U.S.C. § 1703(c), is intelligible if read against the background of the busing controversy which spawned it. That subsection prohibits the assignment of a student to a school other than the one closest to his residence if the assignment results in a greater degree of segregation in the schools based on race, color, sex or national origin. The thrust is directed toward the "neighborhood school" concept, which was so much a part of the busing dispute, and against assignment of students to non-neighborhood schools to achieve segregation on any of the forbidden bases. We do not here face an attempt by a school board to assign "a student to a school, other than the one closest to his or her place of residence within the district in which he or she resides . . . ," 20 U.S.C. § 1703(c).

We conclude the legislation is so equivocal that it cannot control the issue in this case. Our research into the legislative history reveals no indication of Congressional

intent to order that every school in the land be coeducational and that educators be denied alternatives. That drastic step should require clear and unequivocal expression. Judicial zeal for identity of educational methodology should not lead us to presume that Congress would impose such limitations upon the nationwide teaching community by equivocation or innuendo. Congress spoke clearly enough on single-sex schools in 1972 when it chose to defer action in order to secure the data needed for an intelligent judgment. We do not believe that the ambiguous wording of the Equal Educational Opportunities Act of 1974 represented an abandonment of the clearly expressed desire to wait for more information before making a decision. Since no such data were produced, a realistic and, in our view, inescapable interpretation is that Congress deliberately chose not to act and to leave open the question of single-sex schools.[6] We thus have no need to consider the extent to which the legislative body may determine what activity constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment. See Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Cf. Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970).

Finding no Congressional enactments which authoritatively address the problem, we must consider the constitutional issues which provided the impetus for issuance of the injunction.

The district court reviewed the line of recent cases dealing with sex discrimination, beginning with Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and continuing through Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); Schlesin-

H 2165–2177 (March 26, 1974). It appears that the Anderson amendment was introduced as legislation more likely to be found constitutional than that proposed by Mr. Esch.

6. In Weinberger v. Wiesenfeld, 420 U.S. 636, 648 n.16, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514, 525 (1975), Justice Brennan wrote:

"This Court need not in equal protection cases accept at face value assertions of legislative purposes, when an examination of the legislative scheme and its history demonstrates that the asserted purpose could not have been a goal of the legislation." (citations omitted)

ger v. Ballard, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); Weinberger v. Wiesenfeld, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), to Stanton v. Stanton, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). As a result of that analysis, the district judge reasoned that, while the Supreme Court has not held sex to be a suspect classification, a stricter standard than the rational relationship test applies and is denominated "fair and substantial relationship."

In each of the cases cited, however, there was an actual deprivation or loss of a benefit to a female which could not be obtained elsewhere. In Reed v. Reed, supra, the challenged statute would not permit a female to act as the administrator of an estate if a male qualified for the position. In Frontiero, supra, the female officer was deprived of a dependent's allowance which was not available elsewhere. Stanton v. Stanton, supra, rejected a statute which set a longer period of minority for payments in support of males than for females. Kahn and Ballard, by way of contrast, approved benefits to women for which men were not eligible. See Note, The Emerging Bifurcated Standard for Classification Based on Sex, 1975 Duke L.J. 163.

In each instance where a statute was struck down, the rights of the respective sexes conflicted, and those of the female were found to be inadequate. None of the cases was concerned with a situation in which equal opportunity was extended to each sex or in which the restriction applied to both. And, significantly, none occurred in an educational setting.

The nature of the discrimination which the plaintiff alleges must be examined with care. She does not allege a deprivation of an education equal to that which the school board makes available to boys. Nor does she claim an exclusion from an academic school because of a quota system, cf. Berkelman v. San Francisco Unified School District, 501 F.2d 1264 (9th Cir. 1974), or more stringent scholastic admission standards. Cf. Bray v. Lee, 337 F.Supp. 934 (D.Mass. 1972). Moreover, enrollment at the single-sex schools is applicable only to high schools and is voluntary, not mandatory. The plaintiff has difficulty in establishing discrimination in the school board's policy. If there are benefits or detriments inherent in the system, they fall on both sexes in equal measure.

■ Plaintiff cites Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950), and Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), which prohibit racial segregation in the educational process. Those cases are inapplicable here. Race is a suspect classification under the Constitution, but the Supreme Court has declined to so characterize gender.[7] We are committed to the concept that there is no fundamental difference between races and therefore, in justice, there can be no dissimilar treatment. But there are differences between the sexes which may, in limited circumstances, justify disparity in law. As the Supreme Court has said: "[g]ender has never been rejected as an impermissible classification in all instances." Kahn v. Shevin, supra, 416 U.S.,

7. The dissent's paraphrase of Plessy v. Ferguson, 163 U.S. 537, 544, 16 S.Ct. 1138, 1140, 41 L.Ed. 256, 258 (1896), is an imaginative argument contending, in essence, that sex is, like race, a suspect classification. That premise, while eloquently expressed, has not been accepted by the Supreme Court.

In Frontiero, a plurality treated sex as a suspect classification but a majority has not adopted that position despite several opportunities to do so.

In cases where the Equal Protection Clause is at issue, the state must prove a compelling interest to justify a suspect classification. Rarely can this be done. If only a rational relationship is the test, the state generally prevails. Reed v. Reed, supra, apparently establishes a test of "fair and substantial" relationship which falls between the two more traditional norms.

The Equal Protection Clause applies only to the states but in sex discrimination cases the Supreme Court has utilized, in an interchangeable fashion, the Due Process Clause of the Fifth Amendment to reach federal statutes or regulations. Hence, in this opinion we make no distinction between discrimination cases brought under the Fifth Amendment. See Weinberger v. Wiesenfeld, 420 U.S. at 638, n.2, 95 S.Ct. at 1228, 43 L.Ed.2d at 519.

at 356 n.10, 94 S.Ct. at 1738, 40 L.Ed.2d at 194.

■ Equal educational opportunities should be available to both sexes in any intellectual field. However, the special emotional problems of the adolescent years are matters of human experience and have led some educational experts to opt for one-sex high schools. While this policy has limited acceptance on its merits, it does have its basis in a theory of equal benefit and not discriminatory denial.

The only occasion on which the Supreme Court ruled upon a gender classification in school admissions policy was in *Williams v. McNair,* 316 F.Supp. 134 (D.S.C.1970), *aff'd,* 401 U.S. 951, 91 S.Ct. 976, 28 L.Ed.2d 235 (1971), a case which was decided many years after *Sweatt, supra,* and *Brown, supra. Williams* was a summary affirmance of a three-judge district court, and we do not have the benefit of the Supreme Court's reasoning. Yet, the result does have precedential weight for us. *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). The district court's opinion details a fact situation quite similar to that confronting us here, except that the plaintiffs were males who sought admission to a girls' state college. *Reed v. Reed, supra,* had not yet been decided and the district court therefore had no reason to discuss a substantial relationship test. Rather, it applied the traditional rational relationship guidelines. The court said:

"While history and tradition alone may not support a discrimination, the Constitution does not require that a classification 'keep abreast of the latest' in educational opinion, especially when there remains a respectable opinion to the contrary; it only demands that the discrimination not be wholly wanting in reason." 316 F.Supp. at 137.

Believing the problem could not be considered in isolation, the court noted that the school involved was only one in an extensive state system which included several co-ed schools as well as an all male one.

We may not cavalierly disregard *Williams* although it predated *Reed* by a few months.[8] Indeed, the two cases are not inconsistent because the state schools' restrictive admissions policy applied to both sexes, a significant difference from the preferential statutory procedure in *Reed.* This distinction is enough to justify the use of the rational relationship test in *Williams* even though it is likely that the result would have been the same under the substantial relationship formula.

We do not accept *Williams* as being inapplicable merely because males were barred rather than females, as in the case *sub judice.* We are aware of the suggestion that disparity is likely to be favorably considered when it confers on the female some benefit tending to rectify the effects of past discrimination. For example, in *Kahn v. Shevin, supra,* a widow's tax exemption was permissible although no such benefit was provided for a widower. *See also* 1975 Duke L.J. 163, 179; Note, *The Supreme Court 1973 Term,* 88 Harv.L.Rev. 129 (1974). But we have no such exempting qualification here because there is no evidence of past deprivation of educational opportunities for women in the Philadelphia School District. Indeed, the factual findings establish that, for many years past and at the present, excellent educational facilities have been and are available to both sexes.[9]

Since there is no remedial measure at stake, we see no basis for differentiation between *Williams,* and the case at bar. Consequently, we differ with the district court's opinion that *Williams* has only a tenuous applicability here. In our view it is strong, if not controlling authority for denial of an injunction.

■ The record does contain sufficient evidence to establish that a legitimate edu-

---

8. Probable jurisdiction was noted in *Reed v. Reed* on March 1, 1971. Williams was affirmed on March 8, 1971.

9. This fact, in addition to others, distinguishes the case of *Kirstein v. Rector and Visitors of the University of Virginia,* 309 F.Supp. 184 (E.D.Va.1970).

cational policy may be served by utilizing single-sex high schools. The primary aim of any school system must be to furnish an education of as high a quality as is feasible. Measures which would allow innovation in methods and techniques to achieve that goal have a high degree of relevance. Thus, given the objective of a quality education and a controverted, but respected theory that adolescents may study more effectively in single-sex schools, the policy of the school board here does bear a substantial relationship.

■ We need not decide whether this case requires application of the rational or substantial relationship tests because, using either, the result is the same.[10] We conclude that the regulations establishing admission requirements to Central and Girls High School based on gender classification do not offend the Equal Protection Clause of the United States Constitution.

The gravamen of plaintiff's case is her desire to attend a specific school based on its particular appeal to her. She believes that the choice should not be denied her because of an educational policy with which she does not agree.

We are not unsympathetic with her desire to have an expanded freedom of choice, but its cost should not be overlooked. If she were to prevail, then all public single-sex schools would have to be abolished. The absence of these schools would stifle the ability of the local school board to continue with a respected educational methodology. It follows too that those students and parents who prefer an education in a public, single-sex school would be denied their freedom of choice. The existence of private schools is no more an answer to those people than it is to the plaintiff.

It is not for us to pass upon the wisdom of segregating boys and girls in high school. We are concerned not with the desirability of the practice but only its constitutionality. Once that threshold has been passed, it is the school board's responsibility to deter-

mine the best methods of accomplishing its mission.

The judgment of the district court will be reversed.

GIBBONS, Circuit Judge (dissenting).

The majority opinion may be briefly summarized as follows:

The object of the [14th] Amendment was undoubtedly to enforce the . . . equality of the two [sexes] before the law, but in the nature of things it could not have been intended to abolish distinctions based upon [sex], or to enforce social, as distinguished from political equality, or a commingling of the two [sexes] upon terms unsatisfactory to either. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact with each other do not necessarily imply the inferiority of either [sex] to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for [male] and [female] children, which has been held to be a valid exercise of the legislative power even by courts of States where the political rights of [women] have been longest and most earnestly enforced.

The quotation, with appropriate substitutions, will be recognized immediately as the analysis of Justice Brown, for the majority of the Supreme Court, in *Plessy v. Ferguson*, 163 U.S. 537, 544, 16 S.Ct. 1138, 1140, 41 L.Ed. 256, 258 (1896). No doubt had the issue in this case been presented to the Court at any time from 1896 to 1954, a "separate but equal" analysis would have carried the day. I was under the distinct impression, however, that "separate but equal" analysis, especially in the field of public education, passed from the fourteenth amendment jurisprudential scene over twenty years ago. *See, e. g., Brown v.*

---

10. The district court said that "there can be little doubt" that under the rational relation-

ship test the board's regulation would be constitutional.

*Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).[1] The majority opinion, in establishing a twentieth-century sexual equivalent to the *Plessy* decision, reminds us that the doctrine can and will be invoked to support sexual discrimination in the same manner that it supported racial discrimination prior to *Brown.*

But the resurrection of the "separate but equal" analysis is not my most serious quarrel with the majority opinion. What I find most disturbing is the majority's deliberate disregard of an express Congressional finding that the maintenance of dual school systems in which students are assigned to schools solely on the basis of sex violates the equal protection clause of the fourteenth amendment. § 203(a)(1), Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1702(a)(1) (Supp.1976). So long as Congress has acted within the sphere of its legislative competence in making such a finding, I submit, we are not free to substitute a "separate but equal" legislative judgment of our own. Because I conclude that Congress has acted to prohibit the maintenance of single-sex public schools pursuant to its powers under § 5 of the fourteenth amendment, I dissent from the majority's substitution of a "separate but equal" legislative judgment. I would affirm the decision below.

## I

Susan Vorchheimer, the named representative of the class bringing this action, was, when this case commenced, a tenth-grade student at George Washington High School, a co-educational comprehensive, as distinguished from an academic, high school. Upon graduation with honors from Masterson School, an academic junior high school, Vorchheimer applied to Central High School, one of two senior academic high schools in the Philadelphia School District which limit their enrollment to scholastically superior students. Admission to

Central High School is, and has been since its founding in 1836, open to males only. The other senior academic high school is Philadelphia High School for Girls, which, as its name implies, admits only females. Vorchheimer is a scholastically superior student qualified to attend a school in which enrollment is limited to such students, and she chose to do so. But she chose to attend Central rather than Girls High because of Central's academic reputation and her favorable personal reaction to its atmosphere as compared with Girls and a number of other senior high schools she visited. Her application for admission to Central, however, was denied solely on the basis of sex. Having met the qualifications for admission to an academic high school, she could be assigned either to Girls on the basis of her sex or to a non-academic high school within the district on the basis of her residence.

The majority opinion ironically emphasizes that Vorchheimer's choice of an academic high school was "voluntary". It was "voluntary", but only in the same sense that Mr. Plessy voluntarily chose to ride the train in Louisiana. The train Vorchheimer wants to ride is that of a rigorous academic program among her intellectual peers. Philadelphia, like the state of Louisiana in 1896, offers the service but only if Vorchheimer is willing to submit to segregation. Her choice, like Plessy's, is to submit to that segregation or refrain from availing herself of the service.

## II

On August 21, 1974, Congress passed a series of amendments to the Elementary and Secondary Education Act of 1965, 20 U.S.C. §§ 241a *et seq.* One of these amendments was the Equal Educational Opportunities Act of 1974 (hereinafter E.E.O.A.), 20 U.S.C. §§ 1701–1758 (Supp.1976). Section 202(a)(1) of this Act declared it to be the public policy of the United States that "all

---

1. Chief Justice Warren, delivering the unanimous opinion of the Court, stated in pertinent part:

   We conclude that in the field of public education the doctrine of 'separate but equal' has no

place. Separate educational facilities are inherently unequal. . . . 347 U.S. at 495, 74 S.Ct. at 692, 98 L.Ed. at 881.

children enrolled in public schools are entitled to equal educational opportunity without regard to race, color, sex, or national origin." 20 U.S.C. § 1701(a)(1). Had Congress stopped there one could argue, as the majority does, that a policy of "equal educational opportunity" does not preclude a "separate but equal" analysis, at least outside the racial context. But Congress went further. Relying specifically on the legislative authority conferred by § 5 of the fourteenth amendment, it made a series of legislative findings in § 203, the most important of which for the purpose of this appeal was that:

> (1) the maintenance of dual school systems in which students are assigned to schools solely on the basis of . . . sex . . . denies those students the equal protection of the laws guaranteed by the fourteenth amendment. 20 U.S.C. § 1702(a)(1).

We are thus confronted with an explicit legislative finding that the maintenance of a dual school system on the basis of sex violates the equal protection clause. Philadelphia operates such a system in its senior academic high schools. We need look no further than this legislative finding in order to find a violation for which 42 U.S.C. § 1983 provides a remedy. But Congress was not content, as the majority suggests, merely to assert broad legislative findings that might later prove to be inconsistent with or unrelated to its specific statutory scheme, for it defined in § 204 of the amendment a number of unlawful practices based on its findings. 20 U.S.C. § 1703.

Section 204 states in pertinent part that:

> No State shall deny equal educational opportunity to an individual on account of his or her . . . sex . . . by—
>
> (c) the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the district in which he or she resides, if the assignment results in a greater decree of segregation of students on the basis of . . . sex . . among the schools of such agency than

would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student. 20 U.S.C. § 1703(c).

This subsection says that a pupil assignment system which results in increased segregation by sex, as well as race, color or national origin, over what would result in a neighborhood assignment system, is unlawful. At first blush Philadelphia may not appear to operate a neighborhood school assignment system, as that term is used in § 204(c), for its academic high schools since eligibility for enrollment at those schools is determined by scholastic excellence rather than residence within a designated area. The majority opinion contends that § 204(c) is inapplicable to the factual setting of this case because the " 'neighborhood school' concept which was so much a part of the busing dispute" was not "an attempt to abolish single-sex schools." But this view fails to consider Congress' understanding of the meaning of neighborhood school assignment which is disclosed in another subsection of the E.E.O.A. Section 206, 20 U.S.C. § 1705, provides in pertinent part that:

> [T]he assignment by an educational agency of a student to the school nearest his place of residence *which provides the appropriate grade level and type of education* for such student is not a denial of equal educational opportunity or of equal protection of the laws *unless such assignment is for the purpose of segregating students* on the basis of . . . sex . . . . (emphasis added).

It is clear that this subsection must be read in conjunction with § 204(c), for it further clarifies and reenforces the meaning of that provision. Section 206 states that the lawful neighborhood assignment system outlined in § 204(c) also includes the school nearest the student which provides the "appropriate grade level and type of education" unless assignment to that school is for the purpose of segregation on the basis of race, color, sex or national origin. Thus, by assigning academically gifted students to

Central or Girls on the basis of sex, the Philadelphia School Board assigns students in a manner which results in greater segregation of students by sex than if it assigned students solely on the basis of the nearest senior academic high school. The Philadelphia dual system for scholastically superior students not only falls within the legislative finding of the denial of equal protection of the laws, but is also a specified unlawful practice under § 204(c).

While I agree with the majority that the language of § 204(c) must be read with an appreciation of the heated debate over the school busing issue, I cannot agree that this contextual background justifies ignoring the plain language of both the legislative finding in § 203(a)(1) and the specified unlawful practice in § 204(c). Indeed, even in the remedial sections of the E.E.O.A., which are not applicable to the case *sub judice*, Congress has emphasized the prohibition of segregating public school students on the basis of sex. *See* § 216, 20 U.S.C. § 1715. If Congress was not talking about single-sex schools in the provisions quoted above, what was it talking about? A more blatant disregard of the plain meaning of ordinarily well understood words of our common language—"dual school systems", "sex", "assignment by an educational agency of a student to [a] school"—can hardly be imagined. We may not like what Congress has done in enacting this statute but we cannot, as the majority does, simply ignore it. The statutory language of the E.E.O.A. convinces me that Congress did not inadvertently add the word "sex" to the list of prohibited bases for assigning public school students, but included it in those subsections with the express objective of abolishing single-sex public schools.

Rather than discuss the statutory language of the E.E.O.A., the majority engages in an extensive analysis of what Congress did not say or do in enacting that statute. Focusing on what it alleges to be congressional silence on the issue of school assignment on the basis of sex during the hearings and debates on the E.E.O.A., the majority finds an ambiguity in the statute and concludes that "a realistic and, in our view, inescapable interpretation is that Congress deliberately chose not to act and to leave open the question of single-sex schools." This is certainly a novel use of legislative history, or more precisely, of legislative non-history as a tool for statutory construction. The majority argues that Congress spoke clearly in 1972 when it did not enact legislation prohibiting single-sex schools and that the silence of the ninety-second Congress should control this court's interpretation of the words the ninety-third Congress used in enacting the E.E.O.A. in 1974. Congressional silence, especially that of a different Congress, I submit, can never be used to supersede the otherwise clear language of a statute.

Moreover, the majority opinion relies on a misreading of the legislative history of the E.E.O.A. Judge Weis writes that at some point prior to its being passed by the House, §§ 201(a) and (e) of H.R. 13915, the Equal Educational Opportunities Act of 1972, included the word "sex" among the prohibited bases for segregating or transferring students respectively. The majority then asserts that the word "sex" was deleted from those sections without discussion, and from this alleged congressional action draws support for its view that the 1974 legislation is equivocal and anomalous on the subject of single-sex schools. Apart from the issue of the relevance of this alleged action by a different Congress to the proper statutory construction of the plain language of § 204(c) of the E.E.O.A. in which the word "sex" is explicitly mentioned, the majority's description of the 1972 proceedings is inaccurate.

On March 20, 1972, Representative McCulloch, speaking on behalf of Representatives Quie and Gerald Ford, introduced the Equal Educational Opportunities Act of 1972. This bill was modelled in large part after President Nixon's proposals on schools and busing which were sent in a message to Congress on March 17, 1972.[2] At this stage H.R. 13915 did not mention sex in connec-

2. *See* 118 Cong.Rec. 8928–34 (1972).

tion with the existence of dual school systems or the denial of equal educational opportunity. Only race, color and national origin were designated in the unlawful practices section as prohibited bases for segregating, assigning or transferring students. However, after 16 days of extensive hearings, the House Committee on Education and Labor reported an amended version of the McCulloch bill which included sex among the prohibited bases for assigning students in § 201(c) as well as in § 2(a)(1) of the policy and purpose section and § 3(a)(1) of the congressional findings section.[3]

A comparison of the language of the amended version of H.R. 13915 as it was reported out of the House Committee on Education and Labor and read to the entire House prior to passage, with that of the original McCulloch bill as it was introduced, is provided in H.R. 13915, 92nd Cong.2d Sess. (1972). Contrary to the majority opinion's position, this comparison reveals that the word "sex" was never included in §§ 201(a), (e) of the Equal Educational Opportunities Act of 1972. Some confusion, however is created by Representative Pucinski's Section-by-Section Analysis of the Equal Educational Opportunities Act of 1972[4] in which he states that "sex" is included in §§ 201(a), (e). His analysis, however, does not correspond to the actual language of the Act. It is this unofficial version rather than the official language of H.R. 13915 which Judge Weis quotes in the majority opinion. The majority again engages in a novel and impermissible use of legislative history. Finding an unofficial version of the bill which conflicts with the language of the bill itself, the majority adopts the former for the sole purpose of advancing its argument that the House of Representatives was unclear regarding the objectives of H.R. 13915 in 1972, and that the entire Congress was unclear regarding the objectives of the E.E.O.A. when it passed that legislation in 1974. The majority's assertion, however, indicates only that either a particular congressman was confused about the language of H.R. 13915 in 1972 or that Congress inartfully drafted the E.E.O.A. in 1974 when it modelled that statute after the 1972 bill. If we were congressmen we might want to rewrite the E.E.O.A. to include sex in §§ 204(a) and (e). But as a court we must rely upon the language of the statute as written by Congress and resort to legislative history only to help clarify an ambiguity.

If there were some ambiguity regarding the applicability of § 204(c) to the facts of this case, and I believe none exists, the limited 1974 legislative history of the E.E. O.A. on this issue supports the interpretation I espoused above. Because it was pri-

---

**3.** I have found no discussion of why the word "sex" was added to these provisions in either the House hearings or the Committee Report accompanying H.R. 13915. *See* Hearings on H.R. 13915 Before the House Comm. on Educ. and Labor, 92d Cong., 2d Sess. (1972); H.Rep. No.92–1335, 92d Cong., 2d Sess. (1972). But this is not to say that the Committee was unaware that it was linking sex with the maintenance of dual school systems and the denial of equal educational opportunity, for it warned in its report that:

> The provisions in the committee bill barring discrimination on the basis of sex are not meant to preclude separation of the sexes within schools for different courses, such as for gym classes. H.Rep. 92–1335, *supra* at 8.

This concern is reflected in the definition of segregation in Title V of H.R. 13915:

> The term "segregation" is defined to mean the operation of a school system in which students are wholly or essentially separated *among the schools* of an educational agency

on the basis of race, color, *sex* or national origin or *within a school* on the basis of race, color, or national origin. (emphasis added).

Unlike the majority I believe that in 1972 the House of Representatives consciously intended to include the word "sex" in these sections. It should not be forgotten that it was the ninety-second Congress which finally approved the proposed Equal Rights Amendment before it was submitted to the states for ratification. Certainly if the majority is willing to rely on a contextual background in 1972 to assist in the interpretation of 1974 statutory language, it should at least recognize that after more than two years of extensive consideration of a specific constitutional ban on sex discrimination, Congress probably was not acting inadvertently in dealing with single-sex public schools.

**4.** This section-by-section analysis is included in H.Rep.No.92–1335, *supra* at 9–15, and reported as well in 18 Cong.Rec. 28836–38 (1972).

marily an anti-busing amendment, the principal focus of the debate on the Esch amendment 1974 to the Elementary and Secondary Education Act of 1965 was on busing to achieve racial desegregation. Relative silence on the matter of sex discrimination is not surprising, since busing has not thus far been an issue in the sex discrimination context. But there was not, as the majority states, total silence on the subject of sex discrimination in the assignment of students. Congressman William Ford, a co-sponsor of the Esch amendment, explained the proposal in these words:

> The amendment we now have before us would prohibit these types of [dual] school systems and it would prohibit the assignment of students to a school, based on race, color, *sex*, or national origin. 120 Cong.Rec. H 2161 (March 26, 1974) (emphasis added).

An alternative proposal to the Esch amendment was offered by Representative Anderson. This amendment, however, did not include sex among the prohibited bases for assignment of students.[5] But Congressman Anderson's proposal was rejected.[6] In view of this evidence we cannot assume, as the majority does, that Congress did not intend to prohibit the assignment of students on the basis of sex. Congress expressly added sex to the list of prohibited bases for student assignment and consistently refused to delete it.

In summary, some congressmen, reading the majority opinion, certainly will say, as Samuel Shellabarger said with reference to the Supreme Court's interpretation of the fourteenth amendment in *Minor v. Happersett*, 88 U.S. (21 Wall.) 162 (1874), 22 L.Ed. 627 and *United States v. Cruikshank*, 92 U.S. 542, 23 L.Ed. 588 (1876), that "many of the framers of these amendments received *information* regarding their intentions which was *new* . . . ."[7]

### III

The wording of the E.E.O.A. strongly suggests, if it does not compel, the conclusion that it was drafted with an eye to *Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966).[8] Having found that the E.E.O.A. governs this case, we are squarely presented with the precise issue which, according to the majority, we have no need to consider—the extent to which Congress may determine what activity constitutes a violation of the equal protection clause of the fourteenth amendment. The starting point for the consideration of that issue is the text of § 5 itself:

> The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

Is the legislative finding that pupil assignment by sex violates equal protection "appropriate legislation"? In answering that question we can set to one side two rather difficult problems. Certainly state action is involved when the Philadelphia School board makes pupil assignment decisions.[9] Thus, we are not confronted with the question of the extent of congressional power to reach private action by legislation pursuant to § 5.[10] Nor are we confronted with an attempt by Congress to contract rights to

---

5. 120 Cong.Rec. H 2166 (March 26, 1974).

6. *Id.* at H 2177.

7. S. Shellabarger's Memorial Address on Chief Justice Morrison Waite, 126 U.S. 585, 600 (Appendix, 1888).

8. During the course of debate in the House in 1972 on H.R. 13915, Representative Pucinski, among others, argued that the bill was drafted on the basis of the authority granted in § 5 of the fourteenth amendment and defined by the Supreme Court in *Katzenbach v. Morgan, supra*, 118 Cong.Rec. 28835–36 (1972). *See generally* House Hearings on H.R. 13915.

9. *See, e. g., Brown v. Board of Education, supra.*

10. *See United States v. Guest*, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966); Frantz, Congressional Power to Enforce the Fourteenth Amendment Against Private Acts, 73 Yale L.J. 1353 (1964); Note, Fourteenth Amendment Enforcement and Congressional Power to Abolish the States, 55 Cal.L.Rev. 293 (1967). *Cf. Communications Wkrs. of America v. American T. & T. Co., L.L. Dept.*, 513 F.2d 1024 (2d Cir. 1975), *petition for cert. filed*, 44 U.S.L.W. 3067 (U.S. June 19, 1975) (No. 74–1601).

equal protection already determined by the Supreme Court.[11] Congress eschewed any such attempt by concluding its legislative findings in § 203 with the caveat "that the provisions of this chapter are not intended to modify or diminish the authority of the courts of the United States to enforce fully the fifth and fourteenth amendments to the Constitution of the United States." 20 U.S.C. § 1702(b). Here we are dealing only with a case in which, arguably, Congress has gone further in defining the substantive content of the equal protection clause than have the courts.[12]

I say arguably Congress has gone further than the courts, because at this point in the analysis I do not take a position as to the correctness of the majority's treatment of the sex discrimination cases. But for present purposes I am willing to assume that no case has definitely ruled that a sex-based dual school system violates the equal protection clause. So assuming, analysis of the reach of congressional power under § 5 requires still a further refinement. We should distinguish between issues upon which the courts have not ruled, and issues on which the courts have previously rejected an equal protection challenge.

The majority opinion, pointing to *Williams v. McNair*, 316 F.Supp. 134 (D.S.C. 1970), aff'd, 401 U.S. 951, 91 S.Ct. 976, 28 L.Ed.2d 235 (1971) (per curiam), assumes that the Court has rejected an equal protection challenge to a sex-based dual school system. I have serious reservations about the precedential value of the Court's summary affirmance in *Williams v. McNair*, since for all we know the Court's reasons for affirming the judgment of the three

judge district court were other than those relied upon by that court in its opinion.[13] But setting aside those reservations, if *Williams v. McNair, supra,* means what the majority says it means, then this case is controlled by *Katzenbach v. Morgan, supra.*

In *Lassiter v. Northampton Election Bd.,* 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), the Court rejected a fourteenth amendment challenge to the North Carolina English literacy requirement for the exercise of the franchise. In § 4(e) of the Voting Rights Act of 1965, 42 U.S.C. § 1973b(e), Congress provided that no person who has successfully completed the sixth primary grade in a public school or accredited private school in Puerto Rico in a language other than English shall be denied the right to vote in any election because of his inability to read or write English. New York voters challenged the constitutionality of the congressional enactment in *Katzenbach v. Morgan, supra.* Justice Brennan wrote for the Court:

> We hold that, in the application challenged in these cases, § 4(e) is a proper exercise of the powers granted to Congress by § 5 of the Fourteenth Amendment and that by force of the Supremacy Clause, Article VI, the New York English literacy requirement cannot be enforced to the extent that it is inconsistent with § 4(e). 384 U.S. at 646–47, 86 S.Ct. at 1721, 16 L.Ed.2d at 833.

Thus, Congress effectively determined that a state law violated the fourteenth amendment and set it aside even though the Supreme Court had previously rejected an identical challenge. On the authority of *Katzenbach v. Morgan, supra,* we must hold that the legislative findings in § 203(a)(1)

---

11. Compare, e. g., *Katzenbach v. Morgan, supra,* 384 U.S. at 667–68, 86 S.Ct. at 1736, 16 L.Ed.2d at 844–845 (Harlan, J., dissenting) *with id.* at 651–52 n. 10, 86 S.Ct. at 1723–1724, 16 L.Ed.2d at 835–836. *See* Developments—Congressional Power Under Section Five of the Fourteenth Amendment, 25 Stan.L.Rev. 885 (1973).

12. Unlike race, color and national origin, sex has not yet been declared a suspect classification by the Supreme Court. *Compare, e. g.,*

*Loving v. Virginia,* 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010, 1017 (1967) (race); *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194, 198 (1944) (national origin) *with Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) (only four justices deem sex a suspect classification).

13. *But see Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975).

and the prohibition in § 204(c) are proper exercises of the powers granted to Congress by § 5 of the fourteenth amendment, and that by force of the supremacy clause the Philadelphia sex based dual school system for academically gifted high school students cannot remain in operation.

The *Katzenbach v. Morgan* holding has spawned an extensive literature about the respective roles of the Court and Congress, and Congress and the States.[14] *Oregon v. Mitchell,* 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), in which there is no opinion of the Court and no majority consensus as to the reasons in support of its judgment, shows at least that, just as with its commerce clause powers, the congressional powers under § 5 of the fourteenth amendment are not unlimited. One could imagine a congressional enactment of an equal protection standard striking down a state classification that is so arbitrary and unreasonable that the Court would reject it. But at the present stage of evolutionary development of our social institutions a court would be foolhardy indeed to suggest that congressional rejection of a state's gender based classification fell into that category.

Assuming, as the majority does, that *Williams v. McNair, supra,* is authority for a separate but equal treatment of the sexes in public education, one would still have to conclude that the legislative finding of § 203(a)(1)—that separate is not equal for purposes of the fourteenth amendment— has overruled it. Indeed, from an historical perspective, section 5 of the fourteenth amendment would have allowed Congress, had it possessed the decency and will, to overrule *Plessy v. Ferguson, supra,* at any time between 1896 and 1954. Had Congress done so, I suggest, it would have carried the Court along with it. There is much to be said, I submit, in favor of congressional initiative rather than judicial activism in the unfolding of the full meaning of the equal protection clause. When Congress, reflecting the democratic processes, concludes that a state classification is unlawful, its conclusion has the advantage of the authority that comes from democratic consensus, while at the same time its conclusion remains subject to judicial review. When the Court acts similarly, there is neither the authority of consensus nor the safeguard of review by another branch. Thus, the Court should, it would seem, be appropriately deferential to state classifications, while acknowledging, as it did in *Katzenbach v. Morgan,* that Congress need not be deferential to the same degree. 384 U.S. at 651–56, 86 S.Ct. at 1723–1727, 16 L.Ed.2d at 835–838. Certainly Congress has a greater capacity than the Court to weigh the competing considerations. That is not to say, however, that when the Court has struck down a state classification the Congress may feel free to resurrect it. *Id.* at 651–52 n. 10, 86 S.Ct. at 1723–1724, 16 L.Ed.2d at 835–836.

IV

Thus far I have assumed that *Williams v. McNair, supra,* was precedential to the same extent as *Lassiter v. Northampton Election Bd., supra.* If it is not, obviously the decision to defer to the Congressional legislative finding in § 203(a)(1) of the E.E. O.A. is far easier. The district court concluded, and I agree, that decisions subsequent to *Williams v. McNair, supra,* have deprived it of any precedential value it may have otherwise had, and have erected new standards for reviewing gender-based classifications which were not satisfied in this case by the Philadelphia Board of Educa-

---

14. Perhaps the most useful discussions are Cox, The Role of Congress in Constitutional Determinations, 40 U.Cin.L.Rev. 199 (1971), and Cox, Foreword: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv.L.Rev. 91 (1966). Other instructive commentaries include: Cohen, Congressional Power to Interpret Due Process and Equal Protection, 27 Stan.L.Rev. 603 (1975); Note, Federal Power to Regulate Private Discrimination: The Revival of the Enforcement Clauses of the Reconstruction Era Amendments, 74 Colum.L. Rev. 449 (1974); Developments—Congressional Power Under Section Five of the Fourteenth Amendment, *supra* note 11; Note, Fourteenth Amendment Enforcement and Congressional Power to Abolish the States, *supra* note 11; Frantz, *supra* note 11.

tion. Certainly if *Williams v. McNair, supra,* is regarded as authority for the proposition that we review gender-based classifications by the rational relationship standard, it has been seriously undermined by subsequent cases. *See, e. g., Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The majority says that this case does not require a decision regarding the applicable standard because the classification satisfies either the rational relationship or the substantial relationship test. The district court concluded, and, I agree, that since *Reed v. Reed, supra,* the rational relationship test is regarded by a majority of the court as inapplicable to gender-based classifications.[15]

Unlike the majority, I find it particularly difficult to say on the basis of the record in this case that the exclusion of females from Central bears a fair and substantial relationship to any of the Philadelphia School Board's legitimate objectives. Admittedly coeducation at the senior high school level has its supporters and its critics. The majority is also undoubtedly correct in suggesting that a legitimate educational policy may be served by utilizing single-sex high schools. But certainly that observation does not satisfy the substantial relationship test. Some showing must be made that a single-sex academic high school policy advances the Board's objectives in a manner consistent with the requirements of the Equal Protection Clause. *Reed v. Reed, supra,* 404 U.S. at 76, 92 S.Ct. at 254, 30 L.Ed.2d at 229.

The Board, as the district court emphasized, did not present sufficient evidence that coeducation has an adverse effect upon a student's academic achievement. Indeed, the Board could not seriously assert that argument in view of its policy of assigning the vast majority of its students to coeducational schools. Presumably any detrimental impact on a student's scholastic achievement attributable to coeducation would be as evident in Philadelphia's coeducational comprehensive schools which offer college preparatory courses as the Board suggests it would be in its exclusively academic high schools. Thus, the Board's single-sex policy reflects a choice among educational techniques but not necessarily one substantially related to its stated educational objectives. One of those objectives, in fact, is to provide "educational options to students and their parents." (App. at 38a). The implementation of the Board's policy excluding females from Central actually precludes achievement of this objective because there is no option of a coeducational academic senior high school.

Because I agree with the district court that the Board has not made the required showing of a substantial relationship between its single-sex academic high school policy and its stated educational objectives, I would affirm the decision below even if I were willing to ignore the pertinent provisions of the E.E.O.A.

---

15. It must be acknowledged that the appropriate standard against which a disputed gender based classification should be measured as synthesized from *Reed v. Reed, supra; Frontiero v. Richardson, supra; Kahn v. Shevin, supra; Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974); *Schlesinger v. Ballard,* 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); and *Stanton v. Stanton, supra,* does not spring from the pages of United States Reports with immediate clarity. But certainly there appears to be a majority consensus against the mere rational relationship test. *See, e. g.,* Johnston, Sex Discrimination and the Supreme Court—1971–1974, 49 N.Y.U.L.Rev. 617 (1974). *See also* Gunther, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 8–10 (1972).