**PEYOTE WAY CHURCH OF GOD, INC.**

v.

**William F. SMITH, Attorney General of the United States, and Jim Mattox, Attorney General of the State of Texas.**

No. CA 3–82–0778–C.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 7, 1983.

Richard A. Allen and Raymond E. White, American Civil Liberties Union, Dallas Chapter, Dallas, Tex., for plaintiff.

John T. Bannon, Jr., (for Wm. F. Smith) General Litigation and Legal Advice Section, Crim. Div., Dept. of Justice, Washington, D.C., James A. Rolfe, U.S. Atty., Paula Mastropieri-Billingsley, Asst. U.S. Atty., Dallas, Tex., for William French Smith.

Jim Mattox, Atty. Gen. of Texas, Gilbert J. Pena, Chief, Enforcement Section, Douglas M. Becker, Leslie A. Benitez, Asst. Attys. Gen., Austin, Tex., for Jim Mattox.

James G. Abourezk, Atty. Gen. of Navajo Nation, Lawrence A. Aschenbrenner, Deputy Atty. Gen., Elizabeth Bernstein, Staff Atty., Dept. of Justice of the Navajo Nation, Window Rock, Ariz., amicus curiae.

OPINION

WILLIAM M. TAYLOR, Jr., Senior District Judge.

Plaintiff is an Arizona non-profit religious organization with its headquarters in Arizona. It has sued on its own behalf and on behalf of its members to have Tex.Rev. Civ.Stat.Ann. art. 4476–15, § 4.11(a), 4.032, 4.042 & 4.051 (Vernon 1976 & Supp.1982, 21 U.S.C. §§ 841 & 844 (1976) and 21 C.F.R. § 1307.31 (1981) declared unconstitutional under, variously, 42 U.S.C. § 1983, the First, Fifth and Fourteenth Amendments to the United States Constitution and Article 1, § 3 of the Texas Constitution. Also, a preliminary and permanent injunction is sought to vindicate the alleged deprivation of Plaintiff and its members rights under 42 U.S.C. §§ 1981 & 1983 (1976) the First, Fifth, Ninth and Fourteenth Amendments to the United States Constitution and Article 1, § 6 of the Texas Constitution.[1] Essentially, Plaintiff wants to have the right to possess and use peyote buttons as part of the sacraments which is presently illegal under both Texas and Federal law except for members of the Native American Church.[2]

Defendant Smith is charged with the enforcement of the Federal drug laws in Part E of Chapter 13 of Title 21 of the United States Code, 21 U.S.C. § 871 et seq. So he is the logical federal defendant.

Art. 4476–15, Tex.Rev.Civ.Stat.Ann. (Vernon 1976 & Supp.1982), the Texas Controlled Substances Act, does not give similar powers and responsibilities to Defendant Mattox but to the Commissioner of Health of the Texas Department of Health and the Director of the Texas Department of Public Safety. A perusal of the Texas statutes does not show that the Attorney General of the State of Texas has any control over any law enforcement agency of the State or any of its political subdivisions or over the

---

1. The text of these citations will be omitted as they are quite voluminous.

2. Possession is also allowed by the gatherers and dealers of peyote buttons. But that is without significance in this proceeding.

County and District Attorneys of the 254 counties of Texas. But as he is the chief legal officer of the State of Texas, his defense of the questioned Texas statutes is vigorous and he has raised no question as to his being a proper defendant in this civil action, we find that there is sufficient case or controversy between Plaintiff and Defendant Mattox, leaving the question of ripeness as raised by him aside for the moment, for this Court to have jurisdiction over these parties.

The Defendants have moved for dismissal and summary judgment. These motions are ripe for decision. Also, a hearing on the Motion for Preliminary Injunction has been had and is ripe for decision, if the motions of the Defendants are not granted.

### Abstention

Defendant Mattox has moved for the Court to abstain under the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). That doctrine states, in short, that federal courts should not interfere with ongoing state criminal proceedings.

Plaintiff's attorneys have apprised the Court that subsequent to the hearing on the Motions on December 1 and 2, 1982, they were informed that a member of Plaintiff was arrested in Webb County, Texas for possession of peyote on November 19, 1982. No evidence has been adduced as to this incident but there does not seem to be any dispute between the Parties as to whether Plaintiff's member was arrested for possession of peyote.

The question is whether this arrest is sufficient cause for this Court to abstain. The guiding case is *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1974). The Supreme Court said in that case, at page 349, 95 S.Ct. at 2291; "... we now hold that where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but be-fore any proceedings of substance on the merits have been taken place in the federal court, the principles of *Younger v. Harris* should apply in full force." [3] The complaint in this civil action was filed on May 20, 1982, a date anterior to the member's arrest.

Defendant Mattox contends that the arrest of the member was the start of a state criminal proceeding. It is true that the Texas Speedy Trial Act specifies in the pertinent part of Vernon's Ann.C.C.P. art. 32A.02:

> [A] criminal action commences for purposes of this article when an indictment, information or complaint against the defendant is filed in court, unless prior to the filing the defendant is either detained in custody or released on bail or personal bond to answer for the same offense arising out of the same transaction in which event the criminal action commences when he is arrested.

As to that member, undoubtedly *Younger v. Harris* would be of great force. But that is not necessarily so as to Plaintiff.

■ Plaintiff has a ranch in Arizona which is the home of the Church. Only five members of Plaintiff reside there. The remaining, non-resident members are scattered to the four winds. The arrested member is one of the non-resident members. The lack of control over and even of communication with the non-resident members is best shown by the lack of knowledge of the arrest on the part of Plaintiff's officers and counsel from November 19, 1982 until the end of the hearing in this Court on December 1 and 2, 1982.

Also no evidence has been brought forth showing exactly the posture of that Texas criminal proceeding.

The arrested member is said to be a white male. This is important in that Plaintiff, among other things, is making separate claims for its members who have no Indian blood and for those who have Indian blood

---

**3.** The Supreme Court, in *Hicks,* found that though no criminal proceeding was pending against the named plaintiffs, that there were criminal proceedings pending against two of their employees. The Court reasoned that these pending proceedings were sufficient forums for the plaintiffs to raise their constitutional objections.

but less than 25%.[4] The Fifth Circuit said in *Morial v. Judiciary Com'n. of State of La.*, 565 F.2d 295 (1977), cert. den. 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 at p. 297:

> ... *Younger* dismissal is called for only in those circumstances where successful defense of a state enforcement proceeding, initiated before substantial federal proceedings on the merits had occurred, would fully vindicate the federal plaintiff's federal right.

It has not been shown that Plaintiff would have an opportunity to fully vindicate its rights in whatever the state criminal proceedings that may be had against the Plaintiff's non-resident member.

Also, abstention in this case as to the Texas defendant would not terminate this proceeding. Assuming ripeness and standing which will be discussed below, a decision on the merits would still have to be made as to the Federal defendant. For our purposes, the state and federal laws are the same, they both make possession and use of peyote illegal with an exemption for use in Native American Church ceremony (and other non-germane exemptions of a medical nature). Surely, the analysis of Plaintiff's federal rights vis-a-vis one set of laws will be the same as vis-a-vis the other statute. No judicial economy could be had by dismissing Defendant Mattox and going forward with Defendant Smith.

### Ripeness and Standing

Both Defendants have moved for summary judgment on the ground that Plaintiff has not presented a ripe controversy so as to have standing to challenge the constitutionality of the state and federal drug laws on their face and as applied to Plaintiff and its members.

The reason that the Texas laws, not Arizona laws, are being challenged in this suit is that the only major source of peyote in this country is in Texas. So Plaintiff's members, if they are to obtain peyote domestically, must come to Texas to purchase it.

The Supreme Court announced in *Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), that potential defendants need not expose themselves to arrest in order to challenge the constitutionality of a criminal statute. In our Fifth Circuit, the case of *Intern. Soc. For Krishna Consciousness v. Eaves*, 601 F.2d 809 (1979), is an exhaustive explication on standing or justiciability as they relate to anticipatory challenges to the constitutionality of statutes, the Fifth Circuit set out at p. 819 of that opinion a short statement of the applicable test, which reads:

> When we decide whether a case or controversy exists, then, we must focus on the plaintiff's interest in "engag[ing] in a course of conduct, arguably affected with a constitutional interest, but proscribed by a statute." *Babbit v. UFW*, 442 U.S. 289, 298, 99 S.Ct. 2301 [2308], 60 L.Ed.2d 895 (1979).

Both of the officers of Plaintiff who testified at the preliminary injunction hear-

---

**4.** Sec. 4.11(a) of Art. 4476–15, Vernon's Ann. Civ.Stat. provides the following exemption:

> The provisions of this Act relating to the possession and distribution of peyote shall not apply to the use of peyote by members of the Native American Church in bona fide religious ceremonies of the church. However, persons who supply the substance to the church are required to register and maintain appropriate records of receipts and disbursements in accordance with rules promulgated by the director. The exemption granted to members of the Native American Church under this section does not apply to a member with less than 25 percent Indian blood.

The comparable Federal exemption is stated in 21 C.F.R. § 1307.31 as:

> The listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church, and members of the Native American Church so using peyote are exempt from registration. Any person who manufactures peyote for or distributes peyote to the Native American Church, however, is required to obtain registration annually and to comply with all other requirements of law.

The testimony at trial by a distinguished member of the Native American Church is that a person must have 25% Indian blood to be a member of the Native American Church.

ing stated that the use of peyote is central to their religion. Moreover, they stated that Plaintiff had some 200 peyote buttons on hand at that time at the Plaintiff's site in Arizona and that peyote was used on a regular basis by them and their fellow members there at that site.

One of the two officers has no Indian blood so he most certainly cannot avail himself of the exemptions accorded members of the Native American Church. The other officer is 50% American Indian so he could possibly avail himself of those exemptions. But he, personally, as an officer and as the founder of Plaintiff expressed concern that his grandson who lives at Plaintiff's site in Arizona would not be covered by the state and federal exemptions as the grandson is only 12½% American Indian.[5]

Plaintiff's testifying non-Indian officer along with two other members of Plaintiff were arrested here in Dallas County, Texas for possession of peyote in November, 1980 while on a trip to South Texas to obtain peyote. Since then, Plaintiff's members have attempted to grow or purchase peyote in Arizona but have found these to be unsatisfactory sources of supply.

It is apparent that Plaintiff and its members do meet the first and third parts of the Fifth Circuit's test.

As to an "arguably affected . . . constitutional interest," Plaintiff's members' possession and use of peyote is in their religious sacraments. There was considerable testimony at the preliminary injunction hearing as to just how peyote is used in Plaintiff's sacraments. So Plaintiff has raised serious allegations as to its members' religious rights guaranteed by the First and Fourteenth Amendments to the United States Constitution.

### Preliminary Injunction

A plaintiff must make four showings in order to obtain a preliminary injunction in this Circuit as set down in *Canal Authority of the State of Florida v. Calloway,* 489 F.2d 567 (5th Cir.1974). Those four showings are:

1. a substantial likelihood the plaintiff will prevail on the merits,

2. a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted,

3. that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and

4. that granting the preliminary injunction will not disserve the public interest.

It is quite apparent that showings 2, 3 and 4 are conditioned upon a ruling favorable to a plaintiff on number 1. Also, it appears to be true that a showing of substantial likelihood by a plaintiff in a fundamental freedoms case will leave little to be discussed as to the three other showings. In any event, any discussion of numbers 2, 3 and 4 will be omitted because of the Court's view of Plaintiff's likelihood of prevailing on the merits.

Plaintiff makes two arguments on the merits. First, it says that its Free Exercise Clause of the First Amendment's rights as applied to the pertinent federal statutes and regulations and as applied through the Fourteenth Amendment to the state statutes free him from the strictures of those respective statutes. Second, Plaintiff says that the Establishment Clause of the First Amendment, applicable to the federal government and to the state government through the Fourteenth Amendment, are violated by the respective exemptions accorded the Native American Church. As the other side of this argument, Plaintiff sees that its members' equal protection rights have been violated under the Fifth and Fourteenth Amendments by not being accorded the same exemption.

Plaintiff's first contention has been rejected by the Fifth Circuit in *Leary v. United States,* 383 F.2d 851 (1967), rev'd on other grounds, 395 U.S. 6, 89 S.Ct. 1532, 23

---

5. In a response to an inquiry by Plaintiff, the Federal Drug Enforcement Administration sent a letter dated March 4, 1982, to Plaintiff, advising that it does not consider Plaintiff and its members to be exempt from the strictures of the federal drug laws.

L.Ed.2d 57 (1969). The Fifth Circuit reaffirmed this decision in *United States v. Spears,* 443 F.2d 895 (1971), cert. den. 404 U.S. 1020, 92 S.Ct. 693, 30 L.Ed.2d 669.[6]

Leary's other contention that the federal exemption for the Native American Church amounted to religious discrimination is partially or even to a great extent based on two California Supreme Court cases, *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964) and *In Re Grady,* 61 Cal.2d 887, 39 Cal.Rptr. 912, 394 P.2d 728 (1964). Plaintiff, here, also relies heavily on these two cases.

The Fifth Circuit declined in *Leary* to follow the ruling of these two cases. But that declination was not all encompassing. A distinction was made between Leary's use of marihuana as "... an aid to attain conscious expansion by which an individual can more easily meditate or commune with his god" (*Leary,* p. 860) and the Native American Church's "'ceremony marked by the sacramental use of peyote, composes the cornerstone of the peyote religion.'" So it would appear that the Fifth Circuit has left open the question of religious discrimination under the Establishment and Equal Protection Clauses.

Plaintiff has cited *Kennedy v. Bureau of Narcotics and Dangerous Drugs,* 459 F.2d 415 (9th Cir., 1972), cert. den. 409 U.S. 1115, 93 S.Ct. 901, 34 L.Ed.2d 699, in support of its religious discrimination claim. Plaintiff in that case won the battle but lost the war. Two members of the Court in *Kennedy* found unconstitutional discrimination as the Native American Church is afforded an exemption but Kennedy's Church of the Awakening was not afforded exemption. Kennedy lost though, because he proposed a two church exemption which those two members of the Court found to be infected with the same vice of unconstitutional discrimination.

Moreover, the third member of that Court found *Leary,* above, to be applicable as:

> Peyote therefore appears to be a means to an end in the realm of the Church of the Awakening, whereas the Indians worship the drug itself. (p. 418)

The thrust of the majority's decision in *Kennedy* was that the Federal Government could only be concerned with the health of American citizens when it controls dangerous drugs such as peyote.

This was no doubt true when both the Congress and the Texas Legislature passed the federal and state drug control laws. But this is only one side of the coin.

The American Indian Religious Freedom Act, Public Law 95–341, 92 Stat. 469, became effective August 11, 1978. Section 1 of Pub.Law 95–341 enacted 42 U.S.C. § 1996 which reads as follows:

> On and after August 11, 1978, it shall be the policy of the United States to protect and preserve for American Indians their inherent right of freedom to believe, express, and exercise the traditional religions of the American Indian, Eskimo, Aleut, and Native Hawaiians, including but not limited to access to sites, use and possession of sacred objects, and the freedom to worship through ceremonials and traditional rites.

The legislative history of the American Indian Religious Freedom Act, found at 1978 U.S.Code Cong. and Adm.News, p. 1262, is clear in finding that religion is an integral part of Indian culture and that the use of such items as peyote are necessary to the survival of Indian religion and culture.

---

6. The Fifth Circuit in *Leary* did find that: "There is no evidence in this case that the use of marihuana is a formal requisite of the practice of Hinduism, the religion which Dr. Leary professes." (p. 860) Plaintiff does claim that peyote is its central sacrament as peyote is for the Native American Church. The Court of Appeals' exact holding as to the Free Exercise Clause in *Leary* was:

We will not, therefore, subscribe to the dangerous doctrine that the free exercise of religion accords an unlimited freedom to violate the laws of the land relative to marihuana. So the Fifth Circuit's rejection of plaintiff's Free Exercise Clause argument may not be complete. But a perusal of the opinion shows that the Court was not inclined to find any constitutional right to use a dangerous drug in a religious ceremony.

638

No doubt this public policy is also applicable to the Texas exemption for the Native American Church.

As Plaintiff is seeking the use of peyote for its members, it would be incongruous for Plaintiff to argue that the members of the Native American Church should not be granted an exemption from the prohibitions of the state and federal drug laws. So the question to be answered is whether or not it is permissible that the state and federal governments allow only exemptions from their respective drug laws to the members of the Native American Church and not to others who also profess a belief in peyote as a central sacrament.[7]

Plaintiff argues that the United States and the State of Texas are treating the members of the Native American Church as members of a racial group and that singling them out as such is unconstitutional invidious discrimination under the Fifth Amendment (*Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 [1953]) and the Fourteenth Amendment (*Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 [1953]).

The Parties have made much over the case of *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1973). The Court in that case held that the hiring preference for Indians in Section 12 of the Indian Reorganization Act, 25 U.S.C. § 472, was not impermissible racial discrimination. In footnote 24, at page 553, 94 S.Ct. at 2484, the Court found that that preference was not racial in nature but political in nature as it was not directed at Indians as a race but members of "federally recognized" tribes. At pages 554 & 555, 94 S.Ct. at 2484 & 2485, the Court listed other legislation that treats Indians differently that have been upheld by the Court. The penultimate paragraph of the opinion, at page 555, concludes with these two sentences:

As long as the special treatment can be tied rationally to the fulfillment of Congress's unique obligation toward the Indi-

ans, such legislative judgments will not be disturbed. Here, where the preference is reasonable and rationally designed to further Indian self-government, we cannot say that Congress's classification violates due process.

Plaintiff would have *Morton v. Mancari* limited to the Indians who live on reservations or near to reservations. It is true that *Morton v. Mancari* and the cases cited in it at pages 554 & 555, 94 S.Ct. at 2484 & 2485 do relate to Indians who live on or near a reservation so that the precedent may not be exact in the present case. But the reasoning is applicable.

One of the cases cited by the Court in *Morton v. Mancari* at p. 555, 94 S.Ct. at 2485 is *Worcester v. Georgia,* 31 U.S. 515, 8 L.Ed. 483 (1832). Chief Justice John Marshall explained the legal position of the Indians as had been recognized by the earliest European explorer nations. He said, at p. 559: "The Indian nations had always been considered as distinct, independent, political communities, retaining their natural rights.... The very term 'nation,' so generally applied to them, means 'a people distinct from others.'" One year before *Worcester v. Georgia,* Chief Justice Marshall in *Cherokee Nation v. Georgia,* 30 U.S. 1, 11 & 12, 8 L.Ed. 25 (1831) discussed the status of Indians in the United States. He said in pertinent part: "The condition of the Indians in relation to the United States is, perhaps, unlike any other two people in existence.... [T]he relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist nowhere else.... They may, more correctly, perhaps, be denominated domestic dependent nations."

A little over 30 years after these cases, the Court relied upon them in the case of *United States v. Holliday,* 70 U.S. 407, 18 L.Ed. 182 (1865). The essential holding in this case is that Congress can legislate with respect to Indian tribes or their members wherever that tribe or member may be.

**7.** By stating the proposition this way, the question of sincerity of belief is avoided as mandat-

ed in *Leary* at p. 860.

So we see that Indian rights and preferences exist whether or not a person asserting an Indian right or preference lives on or near a reservation. The proper question is really more whether or not the individual is asserting a right or preference as a member of a tribe? So what is a tribe?

The Supreme Court held in *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1967) that treaty rights of Indians survive the termination of supervision over a tribe unless Congress clearly abrogates those treaty rights which are being asserted which would also leave the United States subject to claims for compensation. The Court specifically reserved the question of who could assert those rights. There were two entities proposed by the real parties in interest as the proper party to assert the tribal rights. One was a corporation that had received all of the Menominee's tribal assets that had been held in trust by the United States before the termination of supervision. The other was another corporation which was made up of the members of the Menominee tribe.

The Ninth Circuit has held that some sort of such an organized tribal structure must exist before treaty rights may be asserted. *United States v. State of Washington,* 641 F.2d 1368 (1981), cert. den. 494 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982). That Court's explanation for this test is found at pp. 1372 & 1373 where the Court said:

> This single condition reflects our determination that the sole purpose of requiring proof of tribal status is to identify the group asserting treaty rights as the group named in the treaty. For this purpose, tribal status is preserved if some defining characteristic of the original tribe persists in an evolving tribal community.

The Court went on to further explain that the organization need not take the same form as was present when the tribe came under the supervision of the United States. Indeed, a tribe may have been no more than a cultural group without a political structure. 641 F.2d at 1373.

■ This Court sees the Ninth Circuit's reasoning to be sound. The Congress has a power or duty to the Indians to preserve their dependent nations until such a time as they may become so assimilated so as to not be "a people apart." The exercise of power or duty is not over or to Indians as legalistic "tribes" but as people who have a distinctive culture. Congress in the American Indian Religious Freedom Act has recognized this duty owed. The Federal Government and the State of Texas are furthering this policy by granting an exemption for the use of peyote in the rituals of the Native American Church.

Is there sufficient structure so that it may be determined who is entitled to the State and Federal exemptions? The proof on this point is not overwhelming, to say the least. But Plaintiff has attempted to show its legitimacy by comparing itself to the Native American Church of Navajoland, Incorporated, an organization whose members are exempt. It is not clear that all Indian peyoteists belong to such an organized church.[8] But as to those who do, under the reasoning of the Ninth Circuit in *United States v. State of Washington,* above, there is sufficient structure so that the right of a member to avail himself or herself of the exemptions afforded by the State of Texas and the Federal Government may be determined.[9]

To put this another way, Congress has the power or duty to preserve our Native American Indians (also our Eskimos & Aleuts) as a cohesive culture until such time, if ever, all of them are assimilated in the main stream of American culture. Second, some sort of a formal organization

---

**8.** It is also not clear that the Supreme Court will ever hold such membership in a formal, legal entity to be necessary for Congress to treat an individual Indian as part of "a people apart."

**9.** One could make the argument that under the Supremacy Clause of the Constitution, Art. VI, para. 2, the exemption affording to members of the Native American Church would also exempt them in the same manner from the drug laws of the 50 states.

or community must be extant so that it may be determined who is a member of the culture to be preserved. In the present case, both criteria have been met so that it cannot be said that the Federal Government and the State of Texas have treated the members of the Native American Church as members of a racial group but as part of those dependent nations, "a people apart," that were found here by the earliest European settlers.[10]

As the Court has weighed the evidence presented orally at the Motion for Preliminary Injunction hearing in deciding that motion and the Motions for Summary Judgment, it would be improper to grant those motions. Therefore, Counsel for the Defendants are requested to propose a form of order denying all three motions.

---

10. It also may be said that granting such exemptions does not amount to the establishment of a religion for the same reasons that the doctrine of equal protection has not been violated.